THE STATE OF NEW JERSEY, BY GROVER C. RICHMAN, JR., ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. THERMOID COMPANY, DEFENDANT-APPELLANT.

Argued October 4, 1954—Decided October 25, 1954.

*Mr. Ellis L. Pierson* argued the cause for appellant.

*Mr. Harold Kolovsky*, Assistant Attorney-General, argued the cause for the State (*Mr. Grover C. Richman, Jr.*, Attorney-General of New Jersey, attorney; *Mr. David M. Satz, Jr.*, on the brief).

The opinion of the court was delivered by

WACHENFELD, J.  In 1951 the Legislature enacted a statute providing for an alternate method of escheat of personal property.  It was an amendment and a supplement to the original escheat statutes.

Under the authority of this act, *N. J. S. 2A:37–29 et seq.*, the State commenced the instant proceedings seeking to take into its protective custody unclaimed wages held by the defendant, Thermoid Corporation.  An amended answer, in addition to the other defenses, posed the question of the constitutionality of the cited statute.

The court below determined all issues in favor of the State and entered judgment for $2,160.92, directing the defendant to pay that amount to the State Treasurer for safekeeping by him.  Certification of the appeal from that conclusion was allowed on the court's own motion.  *R. R.* 1:10–1 (*a*).

The State contends the procedure followed by the Legislature in enacting the statute in question is not justiciable in these proceedings, firstly, because the constitutional provision relied on by the defendant is merely a procedural directive rather than a substantive requirement, and, secondly, because the objection to the legislative procedure has not been timely made nor has there been compliance with the statutory directive provided for raising such an objection. *R. S. Cum. Supp.* 1:7–1 to 7, inclusive.

Despite the worth of this argument, we conceive the merits of the constitutional question to be of sufficient importance to require a direct answer.  Consequently, we have put aside

consideration of the reasons urged in the procedural matters to accomplish this purpose.

This leaves before us only one question, to wit, the constitutional integrity of *N. J. S.* 2A:37, *Art.* 3, in the light of *Art.* IV, *Sec.* VI, *par.* 1, of the *Constitution of* 1947, which provides:

"All bills for raising revenue shall originate in the General Assembly; but the Senate may propose or concur with the amendments, as on other bills."

The defendant corporation argues the challenged statute is a bill for raising revenue, and having originated in the Senate, is thus violative of the quoted constitutional requirements.

It is conceded that both the original personal property escheat act of 1946 and the 1951 amendment, which is now Art. 3, had their origin in the Senate, as evidenced by the certificate of the Secretary of the Senate endorsed on each.

In support of its contention that the original personal property escheat act and particularly the alternate method of escheat are revenue-raising measures, the defendant cites their history, origin and purpose and asserts:

"The fact that it is called an alternate method to the seizure of assets by way of escheat under the statute of 1946, which is embraced in Article 37, demonstrates that its purpose is to obtain revenue for the State."

Our courts, the defendant says, have on numerous occasions characterized escheat as part of the revenue law.

In *State, by Parsons, v. Standard Oil Co.,* 5 *N. J.* 281 (1950), affirmed *sub nom. Standard Oil Co. v. State of N. J.,* 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951), we observed that under the common law of England escheats came to be classified as " 'another branch of the king's ordinary revenue.' " This expression was accorded specific approval in *State v. Otis Elevator Co.,* 12 *N. J.* 1 (1953).

In *Conn. Mut. Life Ins. Co. v. Moore*, 333 *U. S.* 541, 68 *S. Ct.* 682, 694, 92 *L. Ed.* 863 (1948), Mr. Justice Jackson, in a dissenting opinion, said:

"But escheat of these interests is a newly exploited, if not newly discovered, source of state revenue."

While Justice Frankfurter likewise wrote:

"In the vigilant search for new sources of revenue, several States have already sought to tap for their own exchequers the matured obligations of unclaimed policies."

We are not naive enough to suggest that the Legislature was motivated solely by an altruistic solicitude for the unknown owners of property rather than by a concern for the abundance of the state coffers. But even though the result of the escheat of the property to the State increases its funds, it does not, because of such result, necessarily follow that the statute under scrutiny is a revenue-raising act within the definition of the constitutional provision by which it must be tested.

The Federal Constitution has a similar requirement, *Art.* I, *Sec.* 7, *cl.* 1, that "Bills for raising Revenue" originate in the House of Representatives.

Interpreting this clause from a constitutional aspect, Mr. Justice Story, in his oft-quoted and consistently followed analysis in his *Commentaries on the Constitution* (*5th ed.*), *vol.* I, *sec.* 880, *p.* 642, concludes:

"* * * A learned commentator supposes that every bill which indirectly or consequentially may raise revenue is, within the sense of the constitution, a revenue bill. He therefore thinks that the bills for establishing the post-office and the mint, and regulating the value of foreign coin, belong to this class, and ought not to have originated (as in fact they did) in the Senate. But the practical construction of the constitution has been against his opinion. And indeed, the history of the origin of the power already suggested abundantly proves that it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes, which may incidentally create revenue. No one supposes that a bill to sell any of the public lands,

or to sell public stock, is a bill to raise revenue, in the sense of the constitution. Much less would a bill be so deemed which merely regulated the value of foreign or domestic coins, or authorized a discharge of insolvent debtors upon assignments of their estates to the United States, giving a priority of payment to the United States in cases of insolvency, although all of them might incidentally bring revenue into the Treasury."

The phrase "revenue laws" was construed in *U. S. v. Hill*, 123 *U. S.* 681, 8 *S. Ct.* 308, 311, 31 *L. Ed.* 275 (1887). The court stated there was a clear implication that it meant

"* * * a law imposing duties on imports or tonnage, or a law providing in terms for revenue; that is to say, a law which is directly traceable to the power granted to congress by section 8, art. 1, of the constitution, 'to lay and collect taxes, duties, imposts and excises.' "

In *U. S. v. Norton*, 91 *U. S.* 566, 23 *L. Ed.* 454 (1875), the Supreme Court observed that the term "revenue" had a very comprehensive meaning and it adhered closely to Webster's definition: "The income of a nation, derived from its taxes, duties or other sources, for the payment of the national expenses."

The court took cognizance of the fact that "other sources" would include proceeds of the sale of public lands, income from the sale of public securities, the receipts of the Patent Office in excess of its expenditures, and the receipts of the Post Office Department "when there should be such excess, as there was for a time in the early history of the government."

Despite the broad meaning of revenue, the court held:

"It is a matter of common knowledge, that the appellative *revenue laws* is never applied to the statutes involved in these classes of cases."

No precise, accurate definition of "Bills" for raising Revenue" need be formulated for purposes of our decision in the instant case. We are left with the impression, as was the United States Supreme Court in *Twin City National Bank of New Brighton v. Nebeker*, 167 *U. S.* 196, 17 *S. Ct.*

766, 769, 42 *L. Ed.* 134 (1897), that "what bills belong to that class is a question of such magnitude and importance that it is the part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject."

Mr. Justice Story's construction of the phrase as above set forth was reaffirmed.

The historical background of personal property escheat is reviewed at length in *State, by Parsons, v. Standard Oil Co., supra,* and *State v. Otis Elevator Co., supra.* In the last cited case the nature of this type of proceeding was defined thusly:

"* * * an escheat action is one by which the State comes into court seeking an accounting of property of which it is the residual owner and a judgment as to its title thereto."

There is, we think, a marked and recognizable distinction between the assumption of protective custody by the State of abandoned property and the production of revenue in the constitutional sense. The statute in the case *sub judice* does not impose a tax nor a levy but governs the falling of property to the sovereign for want of an owner. "Property escheats to the State as part of the common ownership." *State, by Parsons, v. Standard Oil Co., supra,* at *p.* 297.

■■ Additionally, we are ever mindful of the presumption of constitutionality of the legislative enactment. This court has long supported the prevailing rule that every intendment is to be made in favor of the validity of the statute. *In re Paton's Estate,* 114 *N. J. Eq.* 324 (*Prerog.* 1933); *Reingold v. Harper,* 6 *N. J.* 182 (1951); *Nagy v. Ford Motor Co.,* 6 *N. J.* 341 (1951); *Stothers v. Martini,* 6 *N. J.* 560 (1951).

■ Neither the authorities cited by the defendant nor the argument based thereon is sufficient in our view to overcome the undisputed legal presumption. We see no constitutional infirmity in the challenged portions of the escheat laws.

The judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.