JOHN A. KERVICK, STATE TREASURER OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. SALVATORE A. BONTEMPO, COMMISSIONER OF THE STATE DEPARTMENT OF CONSERVATION AND ECONOMIC DEVELOPMENT, *ET ALS.*, DEFENDANTS-RESPONDENTS.

Argued March 10, 1959—Decided April 7, 1959.

470

*Mr. John Lane,* of the New York Bar, argued the cause for the appellant (*Messrs. Warren and Stein,* attorneys).

*Mr. Vincent P. Biunno,* Deputy Attorney General, argued the cause for the respondents (*Mr. David D. Furman,* Attorney General, attorney; *Mr. David J. Goldberg,* Deputy Attorney General, on the brief).

*Mr. Walter H. Jones* argued the cause for the Senate of the State of New Jersey.

*Mr. William F. Hyland* argued the cause for the General Assembly of the State of New Jersey.

*Mr. Wesley L. Lance* argued the cause *amicus curiae.*

The opinion of the court was delivered by

JACOBS, J. On February 25, 1959 the Law Division entered a declaratory judgment which determined that the New Jersey Water Bond Act of 1958 (*L.* 1958, *c.* 35)

*N. J. S. A.* 58:22–19 *note,* was lawfully enacted and that bonds issued thereunder would be direct general obligations of the State. Thereafter the plaintiff appealed to the Appellate Division and we certified on our own motion. See *R. R.* 1:10–1(*a*).

The New Jersey Water Supply Law of 1958 (*L.* 1958, *c.* 34) *N. J. S. A.* 58:22–1 *et seq.* set forth the Legislature's water resources and supply program entailing the construction of the Round Valley and Spruce Run Reservoirs. It was passed by the Senate and General Assembly and approved by the Governor but under its terms was to be inoperative until its companion bill, the New Jersey Water Bond Act of 1958, was approved on public referendum. See *Const.* 1947, *Art.* VIII, § II, *par.* 3. On November 4, 1958 an overwhelming majority of the people voting at the General Election approved the Bond Act. Thereafter, question was for the first time raised as to whether the enactment of the Bond Act was in violation of the bill origin clause of the Constitution which provides that "all bills for raising revenue shall originate in the General Assembly." See *Const.* 1947, *Art.* IV, § VI, *par.* 1. The Bond Act had in fact first been introduced in the Senate and there designated as *Senate Bill No.* 146; it was passed in the Senate on April 7, 1958 by a vote of 15 to 0; it was amended in the Assembly and as amended was passed there on April 24, 1958 by a vote of 53 to 0; on May 5, 1958 the Senate approved the Assembly amendments by a vote of 16 to 0; and on May 12, 1958 the act was approved by the Governor.

The debt limit clause of the Constitution (*Art.* VIII, § II, *par.* 3) provides that "The Legislature" shall not create a debt of the State which together with previous debts exceeds (as here) one per centum of the total amount appropriated by the general appropriation law unless it is authorized "by a law for some single object or work distinctly specified therein"; that "Regardless of any limitation relating to taxation in this Constitution" the law shall provide the ways and means of paying interest as it falls due and principal

within 35 years; that the law shall not be repealed until the debt and interest "are fully paid and discharged"; and that the law shall not take effect "until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon." No one denies that the Bond Act designated the single object or work for which the State's liability was being created, provided the ways and means for paying interest and principal and was submitted for approval by the people of the State in accordance with the terms and spirit of the debt limit clause; but the plaintiff urges, nevertheless, that it was actually a revenue-raising measure within the bill origin clause (*Art.* IV, § VI, *par.* 1), that the requirement of that clause should be construed to be applicable to laws enacted in accordance with the debt limit clause (*Art.* VIII, § II, *par.* 3) and that since the Bond Act originated in the Senate rather than the Assembly it should be declared invalid and of no effect. *Cf. In re Ross,* 86 *N. J. L.* 387, 388 (*Sup. Ct.* 1914).

In rejecting the plaintiff's contention the Law Division rested on three grounds, namely, (1) that the Bond Act was not a measure for raising revenue within the contemplation of the bill origin clause; (2) that even if the Bond Act were viewed as such a measure the bill origin clause may not now be invoked to invalidate the legislation since the clause is directory rather than mandatory; and (3) that in any event the general terms of the bill origin clause do not govern the specific terms of the debt limit clause or affect its "exclusive method of operation." In *State v. Thermoid Co.,* 16 *N. J.* 274 (1954), this court held that escheat legislation empowering the State to appropriate abandoned property is not a revenue-raising measure within the bill origin clause; it expressed approval of Justice Story's oft-quoted view that the bill origin clause relates only to bills to levy taxes in the strict sense and does not extend to bills for other legitimate purposes which may incidentally provide governmental revenue. See 1 *Story,*

*Commentaries on the Constitution* § 880, *p.* 642 (*5th ed.* 1891). In *Millard v. Roberts,* 202 *U. S.* 429, 26 *S. Ct.* 674, 50 *L. Ed.* 1090 (1906), the Supreme Court broadly applied Justice Story's approach to sustain an act of Congress which sought to obtain the elimination of grade crossings and the construction of a railroad station in the District of Columbia. The act originated in the Senate and appropriated sums to be paid to the defendant railroads for the stated purposes and to be assessed upon the taxable property in the District. In the course of its opinion the court stressed the fact that there was no congressional intent to raise revenue for the general conduct of the government and that whatever taxes were imposed were "but means to the purposes provided by the act." 202 *U. S.* at *page* 437, 26 *S. Ct.* at *page* 675, 50 *L. Ed.* at *page* 1093. See *Twin City Nat. Bank of New Brighton v. Nebeker,* 167 *U. S.* 196, 17 *S. Ct.* 766, 42 *L. Ed.* 134 (1897); *United States v. Norton,* 91 *U. S.* 566, 23 *L. Ed.* 454 (1876); *cf. In re Opinion of the Justices,* 152 *N. E. 2d* 90 (*Mass. Sup. Jud. Ct.* 1958); *Chicago, B. & Q. R. Co. v. School Dist. No. 1 in Yuma County,* 63 *Colo.* 159, 165 *P.* 260 (*Sup. Ct.* 1917); *Rosencranz v. City of Evansville,* 194 *Ind.* 499, 143 *N. E.* 593 (*Sup. Ct.* 1924); 51 *Am. Jur., Taxation* § 298, *p.* 350 (1944).

However, in *Morgan v. Murray,* 328 *P. 2d* 644 (*Mont. Sup. Ct.* 1958), a divided court recently held that a bill which provided for a public referendum on a bond issue to obtain funds for the construction of educational facilities was a revenue-raising measure in view of a provision in the bill imposing a new tax to pay principal and interest on the bonds. See *Dalton v. State Property and Buildings Commission,* 304 *S. W. 2d* 342 (*Ky. Ct. App.* 1957); *Wofford Oil Co. v. Smith,* 263 *F.* 396 (*D. C. M. D. Ala.* 1920), appeal dismissed 256 *U. S.* 705, 41 *S. Ct.* 449, 65 *L. Ed.* 1180 (1921). The court rejected *Mikell v. School District of Philadelphia,* 359 *Pa.* 113, 58 *A. 2d* 339, 4 *A. L. R. 2d* 962 (1948), where the Pennsylvania Supreme Court upheld a statute imposing a personal property tax

for public school purposes though it originated in the Senate rather than the House of Assembly. In the course of its opinion the Pennsylvania court took the position that the statute was not a revenue-raising measure but that even if it were so viewed it would not judicially be declared invalid since the bill origin clause was a directory rather than a mandatory provision of the Constitution. Compare, however, 1 *Cooley's Constitutional Limitations* 159 (*8th ed.* 1927), where the distinguished author noted that "courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution." See 11 *Am. Jur., Constitutional Law,* § 69, *p.* 686 (1937).

■■ The defendants point out that in the *Morgan* case the Montana bond legislation was attacked before it was submitted to the people for their approval whereas here the legislation was not questioned until after the people had voiced their overwhelming approval; and they stress that the Montana legislation provided that the bonds would be paid wholly from a new tax whereas the New Jersey Water Bond Act of 1958 provides that the bonds shall be paid from water supply facility revenues and alcoholic beverage tax revenues and, only if necessary, from a new stand-by property tax. See *L.* 1958, *c.* 35, *sec.* 21, *p.* 120. However, we need not pursue these distinctions nor need we consider the soundness of either of the first two grounds advanced by the Law Division, for we are convinced that even though the New Jersey Bond Act of 1958 is viewed as a revenue-raising measure and the bill origin clause is viewed as mandatory, the act was validly adopted within the self-contained terms of the debt limit clause. Examination of the bill origin and debt limit clauses, in the full light of their respective histories and purposes and with the material aid of the practical constructions which have been placed upon them, convinces us that laws passed by the Senate and General Assembly and approved by the people in strict fulfillment of the specific debt limit provisions of *Art.* VIII,

§ II, *par.* 3, are not in anywise subject to the general bill origin provisions of *Art.* IV, § VI, *par.* 1. See *Behnke v. New Jersey Highway Authority,* 13 *N. J.* 14, 31 (1953); *Richman v. Ligham,* 22 *N. J.* 40, 44 (1956); *Lloyd v. Vermeulen,* 22 *N. J.* 200, 206 (1956).

In *Township of Bernards v. Allen,* 61 *N. J. L.* 228, 232–235 (*E. & A.* 1897), Justice Depue discussed fully the history of the bill origin clause; he noted that under the Norman kings of England the right to tax was vested in the king and was exercised by him at his own will; that with heavier burdens of taxation there came increased public resistance which resulted in the Crown's renunciation of the power of taxation and its concession to the people; that since the ability of the Crown to dominate the monarchially appointed House of Lords was patent, the House of Commons as the representative of the people successfully claimed the exclusive right to originate revenue bills; that as early as 1748 the Colonial Assembly in New Jersey asserted the right of the popular branch of the government to originate and adopt revenue measures; and that New Jersey's first Constitution contained a provision that the Council shall have power "to prepare bills to pass into laws, and have other like powers as the assembly, and in all respects to be a free and independent branch of the legislature of this colony; save only, that they shall not prepare or alter any money bill, which shall be the privilege of the assembly." See *Const.* 1776, § 6. When in 1844 New Jersey adopted its second Constitution, the language of the bill origin clause was altered to provide that "all bills for raising revenue shall originate in the house of assembly; but the senate may propose or concur with amendments, as on other bills." See *Const.* 1844, *Art.* IV, § VI, *par.* 1. This language was taken from that embodied in *Art.* 1, § 7, *cl.* 1 of the Federal Constitution and afforded to the State Senate the amendment power which the House of Lords did not have in England and the Council did not have under New Jersey's Constitution of 1776.

New Jersey's Constitution of 1844 for the first time embodied an independent debt limit clause in *Art.* IV, § VI, *par.* 4 to the effect that "The legislature" shall not create any debt which, in addition to previous debts, exceeded $100,000 unless it was authorized by a law which was for some "single object or work" and provided "the ways and means" to pay principal and interest, was irrepealable until the debt was "fully paid and discharged," and was not to take effect until approved by "the people" on public referendum. Nowhere in the debt limit clause was there any reference to the bill origin clause, and the available reports of the 1844 Constitutional Convention contain nothing to indicate that the delegates contemplated that legislative enactments which conformed in all respects to the explicit and highly protective terms of the debt limit clause would also be subject to the general terms of the bill origin clause. See *Proceedings, Const. Conv.* 1844, *pp.* 310, 342, 519 (1942); *cf. McCutcheon v. State Building Authority,* 13 *N. J.* 46, 67 (1953). Whatever practical constructions there were between the 1844 Constitution and the 1947 Constitution evidenced the belief to the contrary. Thus, *L.* 1916, *c.* 285 which provided for a bond issue to finance highway construction, and *L.* 1933, *c.* 387 which provided for a bond issue to aid school districts originated in the Senate and were never questioned; indeed *L.* 1933, *c.* 387 included a provision for a new stand-by tax which was comparable to that contained in the New Jersey Water Bond Act of 1958. And while it is true that many other bond acts originated in the Assembly during the period between the 1844 and 1947 Constitutions, the fair inference to be drawn is that the debt limit clause was generally viewed as exclusive or self-contained, with power in either branch of the Legislature to originate bills being enacted in accordance with its stated requirements.

During the 1844 Constitutional Convention, Delegate Dickerson pointed out that while there had been good reason for vesting the power to originate revenue measures in the

House of Commons rather than in the House of Lords there was little, if any, reason for discriminating between the Assembly and Senate since both were elected by and were responsible to the people; he moved to exscind the bill origin clause but his motion was defeated. See *Proceedings, Const. Conv.* 1844, *supra, p.* 309. Similarly, in the 1947 Constitutional Convention, Delegate Lance moved to exscind the debt origin clause as serving no purpose under our democratic bicameral system; his motion was defeated after Delegate O'Mara defended the clause as one of long standing which perhaps had some continuing value and Delegate Lewis opposed it as an archaic provision which could no longer be supported in reason or logic. See 1 *Proceedings, Const. Conv.* 1947, *pp.* 258–260 (1949). Though the delegates deliberately retained the bill origin clause in Article IV they in no manner suggested any purpose or intent that it was to be carried over into the independent and detailed debt limit clause of Article VIII; indeed whatever pertinent items may be gleaned from the reports of the convention clearly point the other way. See *e. g.* Mr. Tilton's monograph which related to the constitutional limitations on the creation of state debt and was distributed to all of the delegates; while it discussed the 1844 debt limit clause and its requirements and listed all of the earlier bond enactments (including *L.* 1916, *c.* 285 and *L.* 1933, *c.* 387 which had originated in the Senate) it made no mention at any point of the bill origin clause. See 2 *Proceedings, Const. Conv.* 1947, *p.* 1709 (1951).

When Delegate Read successfully proposed that the debt limit clause be amended to include the provision that "Regardless of any limitation relating to taxation in this Constitution" the bond law shall provide ways and means for payment of the debt, he expressed the view that the provision would serve to insure the State's right to issue bonds in accordance with the debt- limit clause in Article VIII, section II, without regard to the restrictions in the new property tax clause embodied in Article VIII, section I.

See 1 *Proceedings, Const. Conv.* 1947, *supra, p.* 772. The sweep of the reference to limitations relating to taxation "in this Constitution" rather than "in this Article" is significant; the obvious concern of the delegates was to make certain that the State's bonds would be legally valid if issued in accordance with the self-contained terms of the debt limit clause in Article VIII, § II, *par.* 3; indeed this was made evident by Delegate Van Alstyne who pointed out that the provision stated "in as clear language as it is possible to use, that regardless of anything else in this Constitution the full faith and credit and the full taxing power of this State will be pledged behind any debt that this State incurs, as voted by the people. That certainly is clearly expressed. So that regardless of anything we do here, there is no doubt that we don't have to worry about our ability to raise funds in the municipal bond market as cheaply as the market indicates." See *Id.,* at *p.* 774.

Since the adoption of the 1947 Constitution it has in practice been construed as permitting bond legislation within the debt limit clause to originate in either the Senate or the Assembly. Thus some bond laws originated in the Assembly whereas others, notably *L.* 1948, *c.* 415, *L.* 1954, *c.* 214 and *L.* 1955, *c.* 218, originated in the Senate. *L.* 1948, *c.* 415, authorized a $15,000,000 bond issue for the establishment and construction of a high-speed transit system for the southern area of the State; it provided for payment from operating revenues and if need be from a new stand-by property tax. *L.* 1954, *c.* 214, authorized a $25,000,000 bond issue for a State Medical-Dental School and Health Center and provided for payment from the cigarette tax and if need be from a new stand-by property tax. *L.* 1955, *c.* 218 authorized a $100,000,000 bond issue for the purpose of acquiring, constructing and developing public water supplies; it provided for payment out of net revenues and franchise taxes under the Corporation Business Tax Act, *N. J. S. A.* 54:10A–1 *et seq.,* and if need be from a new stand-by property tax. The three enactments

were acted upon favorably by both houses of the Legislature and the Governor but did not become operative because they were not approved by a majority vote of the people as required by the debt limit clause; however, there was never any intimation that they were defective because they originated in the Senate rather than the Assembly. Similarly, no question was ever raised during the course of the passage and referendum approval of the New Jersey Water Bond Act of 1958 as to its Senate origin, and before this court the Assembly joined the Senate in the position that the Act, having been enacted and approved by the people in strict accordance with the expressed terms of the debt limit clause, is in nowise impaired by its origin. *Cf. Assembly No.* 6 (1959).

The parties have referred to general principles of constitutional construction which are not in dispute. Thus the plaintiff stresses that all of the provisions of the Constitution must be given fair effect (*Behnke v. New Jersey Highway Authority, supra,* 13 *N. J.* at *page* 24) whereas the defendants stress that the general provisions of the Constitution must give way to its particular provisions (*Id.,* at *page* 31). But these and related construction principles are merely convenient aids to the proper judicial implementation of the overriding constitutional purpose and plan. When the delegates met in 1947 they sought to create a living document embodying their high concepts of democratic government for themselves and oncoming generations. They generally avoided the pitfalls which had resulted from the inflexible provisions in the State's earlier Constitution by replacing them with general expressions of modern governmental principles. Where, as when dealing with the bill origin clause, they bowed to history and determined to retain an ancient concept though it had lost much of its meaning, their judgment must of course be honored; but they would be the last to suggest that its sweep should be any broader than dictated by its antecedents or that it should now be imported into the independent debt limit clause.

The Constitution was made to serve and protect the people of the State and all of its language must be sensibly construed with that uppermost in mind. A bond issue preceded by the safeguarding steps in the debt limit clause necessarily has the support of each branch of the Legislature and the favorable expression of the people of the State. The technical insistence that it also originate by an Assembly rather than a Senate bill could serve no public purpose whatever and we are satisfied that the Constitution imposed no such requirement. Accordingly, the Law Division's declaratory judgment which determined that the New Jersey Water Bond Act of 1958 was lawfully enacted and that bonds issued thereunder would be direct general obligations of the State is in all respects:

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR and HALL—6.

*For reversal*—None.