76 N.J. Super. 232 (1962)
184 A.2d 75
THIOKOL CHEMICAL CORPORATION, PLAINTIFF,
v.
MORRIS COUNTY BOARD OF TAXATION, TOWNSHIP OF DENVILLE, AND J. ELMER VANDERHOOF, TAX COLLECTOR OF THE TOWNSHIP OF DENVILLE, DEFENDANTS, UNITED STATES OF AMERICA, INTERVENOR.
Superior Court of New Jersey, Law Division.
Decided September 6, 1962.
*233 Messrs. Toner, Crowley, Woelper & Vanderbilt (Mr. Marshall Crowley appearing), attorneys for plaintiff.
Mr. Arthur J. Sills, Attorney General of New Jersey (Mr. Alan B. Handler and Mr. Maurice R. Strickland, Deputy Attorneys General appearing), attorney for Morris County Board of Taxation.
Messrs. Jeffers & Mountain (Mr. Albert B. Jeffers, Jr., and Mr. Robert J. DelTufo appearing), attorneys for defendants Township of Denville and J. Elmer Vanderhoof, Tax Collector.
*234 Mr. David M. Satz, U.S. Attorney (Mr. Raymond W. Young, Assistant U.S. Attorney; Mr. Joel Handel, Department of Justice, and Mr. Richard B. Berryman, Department of Navy), attorney for United States of America.
STANTON, J.S.C.
This is an action in lieu of prerogative writs for the review of judgments of the defendant Morris County Tax Board, entered against the plaintiff under chapter 177, Laws of 1949 (N.J.S.A. 54:4-2.3 et seq.), in which the Board affirmed assessments for the tax years 1957 and 1958 under the Omitted Property Assessment Act, N.J.S.A. 54:4-63.12 et seq. The United States of America, the owner of the lands, buildings, plant and facilities involved in this matter, was allowed to intervene and it has filed a joint brief with the plaintiff. There is no factual dispute. Agreed statements of fact are found in the stipulation on file and in the pretrial order. There was brief testimony on behalf of the plaintiff which was not challenged.
As of November 21, 1952 a contract was entered into between the United States of America, through the Department of the Navy, and Reaction Motors, Inc., pursuant to the provisions of the Armed Services Procurement Act of 1947, 10 U.S.C.A., secs. 2301-2314. Over 50 pages in length, it has been designated "Contract NOa 1199." It provides, among other things, for the acquisition of land in the Township of Denville, the erection of buildings thereon, and the installation of machinery and tools therein. The entire cost was paid by the Government. After completion Reaction Motors, Inc. operated the plant for the development and manufacture of rocket and jet engines and fuels required for use therewith. This continued until May 1, 1958, when Reaction Motors, Inc. merged into plaintiff corporation, and the latter has since continued in possession and operation of the premises.
A later agreement was entered into, as of July 30, 1958, between the United States of America and the plaintiff for *235 the operation of the plant. It is referred to as "Agreement for Use of Facilities NOa 5943," and its terms are substantially similar to those contained in the agreement above mentioned. The buildings were specially designed for the unique use to which they were put.
Under the contracts the plaintiff and its predecessor were required to use the facilities exclusively for the performance of work for the Government or its suppliers. The facilities could not be used for the performance of any other work without prior approval of the proper governmental authorities and on terms to be arranged with them. As a matter of fact, during the time with which we are concerned, the facilities were never used except for the performance of work for the Government or its suppliers. During the year 1957, 99.2% of the work in the plant, expressed in terms of sales, was done under prime contracts with the Government. In the year 1958, the comparable figure was 99.7%. The balance of the work in each year was performed for certain prime contractors of the Defense Department.
No rent was paid nor required to be paid for the possession and use of the buildings and facilities. The plaintiff and its predecessor had the right to occupy the premises and use the facilities solely at the will of the Government and under its supervision and control.
Section 1 of chapter 177 (N.J.S.A. 54:4-2.3) reads as follows:
"When real estate exempt from taxation is leased to another whose property is not exempt, and the leasing of which does not make the real estate taxable, the leasehold estate and the appurtenances shall be listed as the property of the lessee thereof, or his assignee, and assessed as real estate."
Section 6 of the statute (N.J.S.A. 54:4-2.8) provides that the taxes shall be a lien upon the leasehold estate, and that the lessee or his assignee shall be personally liable therefor. It should be emphasized that the statute speaks *236 of a lease of real estate and the assessment of taxes upon the leasehold estate as real estate.
The State of Michigan in 1953 adopted a somewhat similar statute. In 1958 the United States Supreme Court passed on several cases which arose thereunder, and two of these are in point here  United States v. Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424; and United States v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436. In Detroit a portion of an industrial plant owned by the United States was leased to Borg-Warner Corporation wherein it carried on its regular business for profit. A tax was levied against the lessee as though it were the owner of the Government realty. It was held that the tax, although measured by the value of the property owned by the Federal Government and used by the lessee, did not violate the constitutional immunity of the United States from state taxation, and further, that the state enactment was not discriminatory nor discriminatorily applied. It should be noted that here there was an outright lease and the lessee was free to utilize the leased premises in connection with its ordinary operations; and it is not without significance that the court in its opinion referred to the tax as a use tax.
In Muskegon the tax was levied upon Continental Motors Corporation, which possessed and used Government-owned lands, buildings and equipment. The court there made this observation:
"There are only two factual differences between this case and No. 26 [United States v. Detroit]. First, Continental is not using the property under a formal lease but under a `permit'; second, Continental is using the property in the performance of its contracts with the Government. We do not believe that either fact compels a different result."
The agreement between the Government and Continental Corporation is somewhat similar to the agreement in our case. However, there is a very substantial difference between *237 our statute and that of Michigan, Pub. Acts 1953, Act No. 189. The latter provides in part as follows:
"Sec. 1. When any real property which for any reason is exempt from taxation is leased, loaned or otherwise made available to and used by a private individual, association or corporation in connection with a business conducted for profit * * * shall be subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of such property * * *." (Emphasis added)
It should be noted that the Michigan statute is not limited to lessees, but applies to anyone to whom the real property is made available and who uses the same.
An examination of the agreements between plaintiff and the Government will disclose, as the defendants contend, that there are some provisions therein which are often found in leases. However, the agreements do not spell out a lease. There is no agreed consideration for the possession and use of the premises. Further, the design and purpose of the agreement was to have the plaintiff perform special and important defense work in the premises for the Government under the direct supervision of a staff which it maintained there for that purpose pursuant to the Armed Services Procurement Act, supra. No authority has been shown which would permit the Department of the Navy to make a lease of the premises in question to the plaintiff. It has been said that it could be done under the Military Leasing Act, 10 U.S.C.A., sec. 2667, amended in 1956, but as far as this case is concerned, substantially the same since its enactment in 1947. However, this section authorizes the leasing of property under the control of a military department, inter alia, only if it is not for the time needed for public use and is not excess property as defined in section 472 of Title 40. That is not the situation here. This land was acquired and the plant constructed for the very purpose of producing defense material by the plaintiff for the use of the Government under its direction and control. The plaintiff is not in possession of *238 the premises as a lessee, and that is a condition sine qua non for tax liability under chapter 177. Ours is not a use tax statute such as that of Michigan, and because of this essential and substantial difference the Muskegon case is not controlling here.
If it be assumed, however, that chapter 177 does apply to the relationship between the plaintiff and the Government, and that a tax may be imposed under Muskegon, the question is presented as to whether or not the statute discriminates against the United States and those with whom it deals, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the requirement of the New Jersey Constitution that property shall be assessed for taxation under general laws and by uniform rules. (Art. VIII, Sec. I, par. 1.)
It is contended by the plaintiff that the design of the Legislature in enacting chapter 177 was indirectly to tax property of the United States; to circumvent the constitutional immunity of the United States from state taxation. The legislative bill which led to the enactment of chapter 177 is known as Senate No. 148 and its history may be enlightening. Accompanying the bill is this statement by its introducer:
"The purpose of this bill is to permit municipalities to levy and assess taxes on exempt property when the same is leased for private use. In many municipalities the Federal Government leases its exempt property to business and industry while the same remains exempt from taxation.
The first section of this bill is taken from the Illinois Annotated Statutes (Chapter 120, Section 507). It has been upheld by the courts of Illinois.
Many other States tax the leasehold estate in lands leased from the United States as the personal property of the lessee. To tax the leasehold estate as real estate avoids the complications inherent in appraising the value of the lease as personal property. A statute is needed for that purpose. A tax on leasehold estates in property owned by the United States is not considered as a tax on the United States (see 23 A.L.R., page 248)."
*239 The original bill did not contain section 10 of chapter 177 (N.J.S.A. 54:4-2.12), which excludes certain property and estates from the operation of the act. In the second reprint of the bill there was added as section 10 a provision for the exclusion of property leased to or by an interstate agency existing under any interstate compact between this State and any other state, and leasehold estates or tenancies in certain designated public housing projects. After the bill was passed in the Senate, the Assembly amended section 10 to include leasehold estates and tenancies in property owned by any municipality. The Assembly passed the bill as amended, and thereafter the Senate concurred. All of the above gives rise to an inference that it was the intention of the Legislature to reach for taxation property owned by the United States through its lessees in a discriminatory fashion  by singling out in effect lessees of the Government as the tax target.
Recently our Supreme Court had before it several cases involving municipal taxation of leasehold interests in tax-exempt public property. A brief consideration of these may be appropriate here. In Walter Reade, Inc. v. Township of Dennis, 36 N.J. 435 (1962), where a lease between the New Jersey Highway Authority and Reade covered buildings containing a restaurant and facilities for the convenience of motorists, the lands and buildings were assessed for taxation against the lessee under chapter 177 by the municipal defendant. A number of issues were presented which the court did not reach for the reason stated at page 438, that "* * * we are satisfied the act creating the Authority intended an exemption even if the facilities were operated under a `lease' and hence the statute upon which the townships rely does not apply." The court further said, at page 441:
"We hold simply that the Legislature intended the Authority to be free of the burden of local taxation whether the Authority achieves the specific public purpose assigned to it by direct operation or through an authorized contractual arrangement with another, *240 and hence the facilities in question may not be assessed to a `lessee' under N.J.S.A. 54:4-2.3 even if it be assumed that the transaction would otherwise be within the reach of that statute."
It might be noted here that the Highway Authority was created by chapter 16 of the Laws of 1952, N.J.S.A. 27:12B-1 et seq.; that section 16 of that act provides for exemption from taxation, and that section 14 of it authorizes the Authority to contract with others for buildings on the project, including restaurants, and to fix the terms, conditions, rents and rates of charges for such use. In Martin v. Collingswood, 36 N.J. 447 (1962), the plaintiff operated a milk bar by agreement with the Camden County Park Commission on its property. The leased premises were assessed for local taxation against the plaintiff under chapter 177. The court held that the plaintiff was not taxable, and at page 451 said:
"Upon the hypothesis we are now pursuing, the case comes within Walter Reade, Inc. v. Township of Dennis, 36 N.J. 435, this day decided. Here, as there, the public agency was empowered to furnish the public use either directly or through an arrangement with a private operator. As we there said, it would be odd to authorize the agency to choose between these methods and then encumber the choice with tax consequences which, realistically, must ultimately be assumed by the agency in the fixing of `rentals.'"
These two cases excluded the "lessees" of a state agency or authority and of a county commission from taxation on the theory that they were performing under appropriate legislative authority an essential public function which would be exempt if the lessor performed it. These cases indicate that New Jersey has treated more favorably, as regards taxation, lessees of its agency and of a county commission than a lessee of the United States. In Redfern v. Jersey City, 137 N.J.L. 356 (E. & A. 1948), New Jersey treated a lessee of one of its municipalities more favorably than it has the plaintiff. Favored also was a municipality operating an airport in a manner similar to a private one, with leases *241 and concessions to others on the premises, in Twp. of Hanover v. Town of Morristown, 4 N.J. Super. 22 (App. Div. 1949). And an interstate agency was favorably treated where it leased its tax-exempt property for a use not within its line of operation. Port of New York Authority v. Newark, 20 N.J. 386 (1956).
When the unique relationship between the United States and the plaintiff, as regards the property in question, and what is clearly a use of it entirely in the performance of very important and highly specialized technical work for the Government in a sensitive area of defense, and the taxation of the plaintiff on the basis of the value of the Government real estate, are contrasted with the tax treatment in the cases just cited, it is obvious that there is discrimination against the plaintiff.
What was said by Chief Justice Warren in Phillips Chemical Co. v. Dumas School Dist., 361 U.S. 376, 385, 80 S.Ct. 474, 4 L.Ed.2d 384, 390 (1960), is apposite here:
"It is true that perfection is by no means required under the equal protection test of permissible classification. But we have made it clear, in the equal protection cases, that our decisions in that field are not necessarily controlling where problems of inter-governmental tax immunity are involved. In Allied Stores of Ohio, Inc. v. Bowers [U.S.] supra, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480, for example, we noted that the State was `dealing with (its) proper domestic concerns, and not trenching upon the prerogatives of the National Government.' 358 U.S., at page 526, 79 S.Ct., at page 440. When such is the case, the State's power to classify is, indeed, extremely broad, and its discretion is limited only by constitutional rights and by the doctrine that a classification may not be palpably arbitrary. Id. 358 U.S., at pages 526-528, 79 S.Ct., at pages 440-441. But where taxation of the private use of the Government's property is concerned, the Government's interests must be weighed in the balance. Accordingly, it does not seem too much to require that the State treat those who deal with the Government as well as it treats those with whom it deals itself. Compare Esso Standard Oil Co. v. Evans, 345 U.S. 495, 500, 73 S.Ct. 800, 97 L.Ed. 1174 [1181]."
And at pages 387, 481 and 391, respectively:
*242 "None of these arguments, urged in support of the Texas classification, seems adequate to justify what appears to be so substantial and transparent a discrimination against the Government and its lessees. Here, Phillips is taxed under Article 5248 on the full value of the real property which it leases from the Federal Government, while businesses with similar leases, using exempt property owned by the State and its political subdivisions, are not taxed on their leaseholds at all. The differences between the two classes, at least when the Government's interests are weighed in the balance, seem too impalpable to warrent such a gross differentiation. It follows that Article 5248, as applied in this case, discriminates unconstitutionally against the United States and its lessee. As we had occasion to state, quite recently, it still remains true, as it has from the time of M'Culloch v. Maryland [U.S.] 4 Wheat. 316, 4 L.Ed. 579, that a state tax may not discriminate against the Government or those with whom it deals. See United States v. City of Detroit, supra (355 U.S., at page 473, 78 S.Ct., at 478)."
The defendants contend that if section 10 of the statute is discriminatory and is violative of constitutional provisions, it should be excised and the remainder of the statute given full force and effect. It is to be noted that chapter 177 contains no severability clause and there is nothing expressed or implied in the act indicating a legislative intent that any part thereof might be severed.
Absent a severability clause, there is a presumption that the Legislature intended the statute to be effective as an entirety. Where is there to be found a legislative intent that the valid part should stand alone? We perceive none. Striking the invalid part would have the effect of broadening in scope that which remained. Where do we find such a legislative intent? None is apparent.
The valid part of the act constitutes the entire original bill. The Legislature refused to enact it in the original form. The amendments were added, it would obviously seem, to induce its passage. The presumption that the Legislature intended the act to be effective as an entirety has not been overcome. Riccio v. Hoboken, 69 N.J.L. 649 (E. & A. 1903); Rutgers Chapter, &c., v. New Brunswick, 129 N.J.L. 238 (Sup. Ct. 1942), affirmed o.b. 130 N.J.L. 216 (E. & A. 1943); State v. Doto, *243 10 N.J. 318 (1952) (concurring opinion); Serner v. Union Tp., 55 N.J. Super. 523 (Law Div. 1959); Sutherland, Statutory Construction (3d ed. Horack), sec. 2412.
The plaintiffs contend that chapter 177 violates Art. IV, Sec. VI, par. 1 of our State Constitution, which provides that:
"All bills for raising revenue shall originate in the General Assembly; but the Senate may propose or concur with amendments, as on other bills."
The defendant township admits that chapter 177 is a revenue-raising act but denies that it violates the constitutional provision. It argues that support for this contention is found in In re Ross, 86 N.J.L. 387 (Sup. Ct. 1914). The defendant Board of Taxation denies that the statute is for the raising of revenue within the contemplation of the constitutional provision which, it argues, is directed only to bills for the raising of revenue for state purposes and to be paid into the state treasury. In support of this argument it cites decisions in several southern and western states of which the following are typical: Rankin v. Henderson, 9 Ky. 861, 7 S.W. 174 (Ct. App. 1888); Houston County v. Covington, 233 Ala. 606, 172 So. 882 (Sup. Ct. 1937). These are not persuasive in the light of our own adjudications. It cites also Kervick v. Bontempo, 29 N.J. 469 (1959), but this does not support its argument. There it was held that the New Jersey Water Bond Act of 1958, which had its origin in a Senate bill, was validly enacted within the self-contained and independent provision of the debt limit clause of the Constitution and was not subject to the bill origin clause. A reference there by the court to an earlier case is worthy of note and quote here:
"* * * In State v. Thermoid Co., 16 N.J. 274 (1954), this court held that escheat legislation empowering the State to appropriate abandoned property is not a revenue-raising measure within the bill *244 origin clause; it expressed approval of Justice Story's oft-quoted view that the bill origin clause relates only to bills to levy taxes in the strict sense and does not extend to bills for other legitimate purposes which may incidentally provide governmental revenue. See 1 Story, Commentaries on the Constitution, § 880, p. 642 (5th ed. 1891). * * *"
The plaintiff contends that all taxes assessed and collected by municipalities are state taxes though collected by the municipality under power granted by the State. There is support for this contention in various adjudications in this State. In Camden and Amboy Railroad Co. v. Hillegas, 18 N.J.L. 11 (Sup. Ct. 1840), it was said at page 13:
"All taxes, are in fact, state taxes: they are raised under the authority of the state, and are all applied to state purposes: namely, to the support of government in all its departments; to the payment of its officers and agents, the erection and maintenance of public buildings, roads and bridges, and the support of the poor. They are not different taxes; but they are taxes, levied by the same authority, though distributed into different channels for the sake of public convenience."
In Vreeland v. Jersey City, 43 N.J.L. 135 (Sup. Ct. 1881), it was said at page 138:
"It stands upon the same plane with any other tax imposed for municipal purposes. It stands upon a plane with taxes levied for state, county or township purposes, so far as they are affected by the operation of the constitutional rule. All imposts for county and township purposes are state taxes and can be imposed by no other authority. Camden and Amboy R.R. Co. v. Comm'rs, 3 Harr. 71; Camden and Burl. R.R. Co., pros., v. Cook, Coll'r., 3 Vroom 338.
All general taxes, therefore, imposed upon property have one origin  the exercise of the sovereignty inherent in the state * * *."
See also State Board of Assessors v. Central R.R. Co., 48 N.J.L. 146 (E. & A. 1886); Jersey City v. Martin, 126 N.J.L. 353 (E. & A. 1941); Jersey City v. State Board of Tax Appeals, 133 N.J.L. 202 (Sup. Ct. 1945).
In the Ross case the bill was introduced and passed in the Senate and then carried to the Assembly, where it was *245 referred to a committee. It was reported favorably out of committee but was later recommitted. It was then reported to the Assembly as an Assembly substitute for the Senate bill. This bill was then passed by the Assembly and carried to the Senate where the Assembly action was not merely concurred in but the Senate considered the bill on three separate readings, as though it were an original Assembly bill and passed it. The court held the substitute bill was to be considered as one that originated in the Assembly and therefore validly enacted. The defendant township argues here that the action of the Assembly in amending the Senate bill, in effect made it an Assembly bill, and the subsequent concurrence by the Senate in the amendment was in effect the passage of an Assembly bill by the Senate. This argument goes far beyond the holding in Ross and is not at all tenable.
There is a tendency in many places to belittle the bill origin clause in the State Constitution on the theory that there is no practical need for such a provision in these days in our State. However, the fact remains that it is a part of the Constitution and must be observed and enforced.
It is concluded that the statute is invalid as to the United States of America and the plaintiff and that the judgments of the Morris County Tax Board should be vacated.
Submit judgment accordingly.