OPINION TO THE GOVERNOR.

OCTOBER 18, 1962.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

110

OPINION with respect to reapportionment of house of representatives rendered by four justices to governor follow-

ing request submitted to supreme court in accordance with provisions of article XII, §2, of amendments to state constitution. Concurring opinion by Condon, C. J.

October 18, 1962

To His Excellency John A. Notte, Jr.
Governor of the State of Rhode Island
and Providence Plantations

We have received from Your Excellency a request for our written opinion in accordance with the provisions of article XII, section 2, of amendments to the constitution of this state upon certain questions of law which you propound in your letter as follows:

"1. Is the membership of the present House of Representatives, having been elected pursuant to the apportionment in Chapter 22-2 of the General Laws, competent to act validly on legislation and other matters entrusted by law to the House of Representatives, and is the legislation heretofore enacted by said House of Representatives validly enacted?

"2. In the light of the special commission's report of September 5, 1962, does the action of the Assembly set forth in H-1022

"(a) making a legislative determination that it would be impossible to enact reapportionment legislation to be effective for the 1962 general election, and

"(b) continuing the commission in existence and directing it to report back no later than March 1, 1963, with specific legislation implementing specific recommendations

meet the obligation of the General Assembly to act 'within such reasonable time as circumstances may permit' to provide for reapportionment conformable to the 1960 census and to the opinion of the Supreme Court in *David Sweeney, et al* v. *John A. Notte, Jr., et al,* supra?

"3. Notwithstanding the determination of the Supreme Court in its advisory opinion filed August 22,

1962, and its decision in the case of *David Sweeney, et al* v. *John A. Notte, Jr., et al,* supra, as to the existence of a present obligation to reapportion the House of Representatives, will persons nominated on September 11, 1962, and elected on November 6, 1962, to a house of representatives composed of members elected from districts apportioned as provided presently in Chapter 22-2 of the General Laws have jurisdiction during the term for which they are elected to act in all matters entrusted by the Constitution of Rhode Island to the House of Representatives?"

The question numbered 1 makes inquiry first as to whether the present house, being malapportioned, is "competent to act validly on legislation and other matters entrusted by law to the House of Representatives * * *." It contains also a corollary inquiry concerning the validity of prior legislative enactments of the present house. The question, as we understand it, is directed primarily at the competence of the present house to exercise the legislative power of the state. In its secondary aspect it inquires whether the prior legislative enactments of the present house were mere nullities for the reason that it was without authority to exercise the legislative power.

The question of law upon which our opinions are sought posits a house and a senate comprising the general assembly which is the repository of the legislative power of the state. Our attention is therein directed to the effect, if any, of the malapportionment of the present house upon its competence, that is to say its authority, to exercise the legislative power of the state. It is concerned not with the validity of legislation as the end product of an exercise of the legislative power by the house but with the authority of the house to exercise that power at all. It is obvious that in the context of the instant inquiry the validity of prior legislative enactments of the present house must depend entirely upon whether the malapportionment thereof deprived it of all authority to exercise the legisla-

tive power or to do those things, the performance of which is committed by the constitution to the house.

The formulation of question numbered 1 is such as to preclude its being construed as including within its scope inquiry concerning the validity of laws, that is, the end product of an exercise of legislative power, by reason of the impingement thereof upon any of the constitutional guarantees, federal or state. If the question were intended to be of such scope, we would be unable to answer unless we had before us some specific legislation, either enacted or proposed. We conclude, therefore, that the instant inquiry is limited to the effect of the malapportionment of the present house upon its authority to exercise that portion of the legislative power that reposes therein or, to put it otherwise, whether a purported exercise of the legislative power by the present house is in fact a nullity because its authority to exercise that power was extinguished by reason of its malapportionment.

We undertake then to answer the first question only with respect to the effect of the malapportionment of the present house upon its authority to exercise the legislative power of the state. We do not intend thereby to be understood as ruling that law which results from an exercise of the legislative power may not, upon attack that suffices to overcome the presumption of constitutionality, be found invalid for the reason that it was enacted in violation of the right of the citizenry to equality of representation secured by the equal protection clause of the federal constitution.

It is well settled that the powers of the federal government were conferred upon it at the time of the adoption of the federal constitution and that the legislative power of the states, excepting such portions thereof as were conferred upon the federal government at that time, was retained by the several states. The proposition that the states retained the legislative power is set out in clear and

understandable language in *Carter* v. *Carter Coal Co.*, 298 U. S. 238. In that opinion at page 294 the court said: "The states were before the Constitution; and, consequently, their legislative powers antedated the Constitution. Those who framed and those who adopted that instrument meant to carve from the general mass of legislative powers, then possessed by the states, only such portions as it was thought wise to confer upon the federal government; and in order that there should be no uncertainty in respect of what was taken and what was left, the national powers of legislation were not aggregated but enumerated—with the result that what was not embraced by the enumeration remained vested in the states without change or impairment." See *Munn* v. *Illinois*, 94 U. S. 113, 124.

Inhering in the legislative power thus reserved to the states is the power to formulate, establish, and maintain representative governments therein. Under the provisions of sec. 4 of art. IV of the federal constitution the United States is required to guarantee a republican form of government to every state. In *Minor* v. *Happersett*, 88 U. S. 162, at page 175, the court pointed out that the guaranty clause does not designate the exact form of government that is so guaranteed but said: "The guaranty necessarily implies a duty on the part of the States themselves to provide such a government." A republican form of government contemplates representative government and, the states being obligated to provide such government, obviously they have the power to establish and maintain such government.

State constitutions, on the other hand, are generally held to operate as limitations upon the exercise of the legislative power of a state by a legislative branch of the government thereof. "A multitude of cases and authorities could be added to the effect that insofar as the legislative branch of the General Assembly is concerned, constitutional provisions, in general, operate as limitations rather than grants

of power; that except as a limitation on the power of the Legislature to enact legislation is found in the *Constitution*, such limitation does not exist." *State ex rel. Morford* v. *Emerson*, 40 Del. 328, 345. See *Opinion to the Senate*, 137 Me. 350; *Commonwealth ex rel. Kelley* v. *Keiser*, 340 Pa. 59.

There are numerous authorities which hold that the legislative power of a state is plenary and, except as constitutionally limited, is absolute. "The Constitution is not a grant of power to the Legislature, but it is a limitation of its general powers.* * * The Legislature's power is practically absolute, except for constitutional limitation. * * * Subject to constitutional restraints, the state Legislatures have been compared to the British Parliament, whose 'power and jurisdiction,' according to Lord Coke, 'is transcendent and absolute.'" *Rafus* v. *Daley*, 103 Vt. 426.

This court has long adhered to this view of the plenary nature of the legislative power possessed by the general assembly of this state. In *Payne & Butler* v. *Providence Gas Co.*, 31 R. I. 295, it said at page 315: "* * * when we adopted the federal constitution, the legislature had the combined powers of crown and parliament, and thereafter until May, 1843, the date of the adoption of our constitution, the General Assembly had the full powers of crown and parliament less whatever power had been granted to the federal government. After the adoption of the State constitution the legislature had the powers of crown and parliament aforesaid, less the power taken therefrom for the federal government and also minus whatever powers were taken from it by the constitution of the State * * *." In an earlier decision in the case of *Henry* v. *Cherry & Webb*, 30 R. I. 13, the court pronounced its acceptance of this proposition more succinctly when it said at page 30: "The General Assembly of Rhode Island succeeded to all the powers of the British Parliament except

as limited by the constitution of the United States or the State of Rhode Island."

We are of the opinion then that the present house, as a component of the general assembly, possesses the legislative power of the state and, malapportioned as it is, is competent, that is to say has authority, to exercise that power to the extent that it is not prohibited from so doing by the constitution of this state. The portion of the legislative power of this state conferred upon the federal government in no manner authorizes that government to prohibit by antecedent action the state legislature from exercising the legislative power of the state. We conclude then that the question to which we must address ourselves is whether there is in our constitution any provision that may be construed as limiting the authority of the house to exercise the legislative power by reason of malapportionment.

It now becomes appropriate to advert to sec. 10 of art. IV of our state constitution wherein it is provided that "The general assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution." This provision was not intended, however it might appear at first glance, to provide for the exercise of the legislative power during the period of transition from goverment under the charter to government under the constitution. Constitutional provisions for the transition of governmental function are contained in art. XIV of the state constitution. The provision contained in sec. 10 of art. IV was intended to apply during the whole period that the constitution remains in effect. See *In Re The Constitutional Convention,* 55 R. I. 56, at page 63.

Under the charter government the authority of the general assembly of this state to exercise the legislative power was plenary. The pertinent provision of the constitution, sec. 10 of art. IV, is clearly declaratory of the framers' intention that the authority of the legislature to exercise

that power was to be restricted only by prohibitory constitutional provision. We regard said sec. 10 of art. IV as being significant of an acceptance of the concept of broad authority of the general assembly as being prudential. This court in *In Re The Constitutional Convention, supra,* in quoting from the constitutional writings of Judge Bradley, said at page 71 of that opinion: "Under the charter government, the General Assembly possessed all powers. Many of the people of the State preferred this patriarchal government to the division of powers systematically arranged in the usual State constitution. They yielded reluctantly to the pressure and persuasion of enemies and friends. While granting a constitution, they yet incorporate in it the provision that the General Assembly shall continue to exercise the powers they have hitherto exercised unless prohibited by the constitution."

This court in *In Re The Constitutional Convention, supra,* interpreted the word "prohibited," contained in sec. 10 of art. IV, as being used in a strong sense, saying at page 66 of that opinion: "The word 'prohibited' is a strong word and in our judgment is not satisfied by anything short of a prohibition that is clearly, definitely and necessarily implied, even if it does not require that the prohibition be express." It is our opinion that the above language of the court is peculiarly appropriate in the instant circumstances wherein we seek to determine when the constitution prohibits, for any reason, an exercise of the legislative power of the state by the general assembly.

We must seek then to ascertain whether there is in the constitution some provision that expressly or by necessary implication prohibits an exercise of the legislative power of the state by the general assembly because of a failure to comply with the mandate to apportion set out in art. XIII of amendments. Such a provision, if any there be, would be set out ordinarily in those portions of the constitution which provide for apportionment of the general

assembly and, in the instant case, in art. XIII of the articles of amendment which provides for the apportionment of the house. We have examined the provisions of art. XIII of amendments to the constitution, and we find no provision thereof that could be reasonably construed as prohibiting the house, as a component part of the general assembly, from exercising the legislative power of the state by reason of its failure to comply with the provisions thereof directing the method and basis of its apportionment.

We conclude then that the framers of our constitution, recognizing the general assembly as the repository of legislative power, declared in that document that the assembly's exercise of that power was to be limited only by express or necessarily implied constitutional prohibition. Absent such prohibition in the constitution, the authority of the assembly or of the house as a component part thereof remains unimpaired. It is our further opinion that this authority to exercise the legislative power is not prohibited by necessary implication within the meaning of sec. 10 of art. IV because of a legislative failure to comply with constitutional provision relating to its apportionment. This conclusion contemplates, of course, that the malapportionment is not such as deprives the people completely of representative government and therefore of a republican form of government.

We say then in answer to the question numbered 1 that the present house is competent to act in an exercise of the legislative power of the state and that the prior legislative enactments of the present house, insofar as the authority of that house to exercise the legislative power is concerned, were validly enacted.

We turn to a consideration of the question numbered 3 propounded by Your Excellency, being of the opinion that this question, in effect, merely projects into a new time context the inquiry set out in your question numbered 1.

With the question numbered 3 as with the question numbered 1, we take the view that it concedes the election of the next house on the basis of the apportionment provided for in G. L. 1956, chap. 2 of title 22. The inquiry appears to be whether the members of the next house, having been elected thereto under an apportionment statute already declared unconstitutional, have "jurisdiction" to act in all matters entrusted to them by the constitution.

We are persuaded that the word "jurisdiction" is to be given the same meaning that was given to the word "competent" in question numbered 1, that is, as pertaining to the authority of the members of the house to exercise the legislative power of the state and the effect thereon, if any, of the conceded malapportionment of the house. In other words, we conceive question numbered 3 to ask whether the members of the house that will be elected under the apportionment statute held to be unconstitutional will have authority to exercise the legislative power of the state. Viewed in that light, we would answer the question affirmatively.

The decision to attribute such a meaning to the word "jurisdiction" was not reached without some difficulty. We are aware that the question is susceptible of being construed as asking whether the next house of representatives, having been elected pursuant to an apportionment statute that this court held to be unconstitutional, could be a house constituting in part the repository of the legislative power of the state. In other words, we have considered whether the question does not go to the very possession of the legislative power of the state by a house, the malapportionment of which is clear. To so construe the word "jurisdiction" would raise an inquiry as to the validity of the election of certain of the members of the house in the general election to be held on November 6 next pursuant to the constitutional mandate therefor set out in art. XVI of the amendments to our state constitution. After mature deliberation,

however, we are persuaded that had the question been intended to inquire into the effect of malapportionment upon the elective process mandated by the constitution, Your Excellency would have phrased it in such a manner as to make that intention absolutely clear.

This is not to say, however, that we take the view that legislative inaction concerning the apportionment of the house would nullify the elective process prescribed in our constitution. It certainly does not follow that the sovereign people of this state can be reduced to such a condition of political impotency as to be unable to preserve representative government because of legislative dereliction in the matter of correcting the present malapportionment of the house. Such a contention would be clearly inconsistent with the basic concept of constitutional government. We know of no constitutional principle upon which it may be validly asserted that the legislature may demolish the structure of representative government in this state by the simple expedient of neglecting or refusing to apportion itself consistently with the right to equality of representation guaranteed by the equal protection clause of the federal constitution. Such inaction on the part of the legislature will not operate so as to deprive the people of their power to preserve representative government by resort to the elective process that is secured to them by the provisions of art. XVI of the amendments to the state constitution. The very purpose of art. XVI is to secure to the people the right to correct governmental dereliction by resort to political action.

To put it otherwise, we are not aware that under a constitutional government because an apportionment statute deprives some of the people of the substantial equality of representation contemplated in the equal protection clause, the entire citizenry is therefore to be deprived of all representation. To so negate the power which inheres in the

sovereignty of the people to establish and maintain representative government is inconceivable. In this respect we agree with those courts which have held that legislative inaction as to the correction of malapportionment casts the continuing burden upon successive legislatures to accomplish such a correction of the malapportionment. The inescapable implication of these decisions is that despite malapportionment successor legislatures may be lawfully elected and possess the authority to exercise legislative power to correct such inequalities of representation. See *Opinion to the Senate*, 148 Me. 404; *Botti* v. *McGovern*, 97 N. J. L. 353; *Fergus* v. *Kinney*, 333 Ill. 437; *People ex rel. Carter* v. *Rice*, 135 N. Y. 473; *Opinion of the Justices*, 254 Ala. 185; *Opinion of the Judges*, 61 S. D. 107. However, it being our position that question numbered 3 posits the valid election of the next house and inquires as to its authority to exercise the legislative power of the state, we answer it in the affirmative.

We turn now to a consideration of question numbered 2 as propounded by Your Excellency. Our attention is directed therein to a legislative declaration contained in H-1022 enacted at the special session of 1962 which reads in pertinent part: "* * * it is impossible to reapportion the House of Representatives * * * so as to take effect for the 1962 general elections * * *." Our attention is directed further to the language of the resolution contained in said H-1022 wherein the special commission to study reapportionment is authorized "to continue its study and make its report to the General Assembly on or before March 1, 1963 * * *."

We are then asked whether, in view of the declaration of the general assembly above quoted, its action in prolonging the existence of and extending the time within which the special study commission is empowered to submit a report and proposed legislation for reapportionment constitutes a sufficient compliance with its constitutional obligation to

provide for a reapportionment of the house conformable to the 1960 census "within such reasonable time as circumstances may permit * * *." That language of the question last quoted is taken from the opinion of this court in *Sweeney* v. *Notte,* 95 R. I. 68, 82, 183 A.2d 296, 303. When this language is examined in the context in which it appears in that opinion, it is obvious that its reference is not to any order of this court to apportion, for none was made. Rather the reference is clearly to the constitutional obligation of the general assembly to reapportion after each decennial census as provided for in art. XIII of amendments to our state constitution.

The inquiry thus relates clearly to the constitutional doctrine of separation of powers, but in our opinion it may be answered without indulging in any elaborate discussion concerning that doctrine. It suffices to say, as we so clearly did in *Sweeney* v. *Notte, supra,* that the apportionment of representation is peculiarly a matter within the legislative power and that this court may not, at least with propriety, purport to pass judgment upon the suitability or wisdom of the means which the legislature takes to discharge that duty. Long-standing policy requires the courts, under our constitutional system, to recognize that the coequal branches of the government are entitled to a presumption that they are, in their doings, acting in good faith to discharge the obligation which, like the court, they undertook by their oath to support and preserve the constitution. In *Maryland Committee for Fair Representation* v. *Tawes,* 228 Md. 412, 430, 180 A.2d 656, 666, the Maryland court, quoting from *State* v. *Rogers,* 56 N.J.L. 480, said in its opinion: "A judiciary, conscious of the sacrosanct quality of its oath of office to uphold the Constitution, cannot accept an *in terrorem* argument based upon the notion that members of a coequal part of the government will not be just as respectful and regardful of the obligations imposed by their similar oath."

In view of the circumstances here, we conclude that the general assembly is entitled to a presumption that, in prolonging the life of the special study commission ·and in extending the time within which it is authorized to submit proposed corrective legislation, it was acting in good faith to reasonably discharge its constitutional obligation with such reasonable promptitude as the circumstances permit. In so concluding we considered as significant the fact that the general assembly did not enact any resolution for final adjournment and that, therefore, it has not precluded submission to it by the study commission of proposed legislation for such reapportionment. Apropos of this latter point it must be noted that it is provided in art. XVI of the articles of amendment to our state constitution that members of the general assembly continue in office until their successors are elected and qualified. That the extension to March 1, 1963 of the time within which the study commission has authority to report may have the effect of casting upon the next general assembly the duty of accomplishing the reapportionment of the house does not, in our opinion, render invalid a presumption that it was acting in good faith.

Because we reach the conclusion that the action of the general assembly in prolonging the life of the special study commission and extending the time within which it has authority to submit proposed corrective legislation constitutes action designed to accomplish compliance with its constitutional obligation to apportion the house and that, in so doing, its action is entitled to a presumption that it was undertaken in good faith, we answer question numbered 2 in the affirmative.

THOMAS H. ROBERTS
THOMAS J. PAOLINO
WILLIAM E. POWERS
G. FREDERICK FROST

I concur in the answers to questions 1 and 2 but for reasons somewhat different from those stated by my associates. To state my reasons would needlessly prolong this opinion and in the existing circumstances would scarcely serve any useful purpose.

I do not agree with the form of the answer to question 3 but I concur in the answer itself for the following reason. In my opinion the members of the house of representatives who will be elected on November 6, 1962 will *necessarily* be clothed with jurisdiction to exercise the legislative power inherent in the house under the state constitution. However, in view of the decision of this court in *Sweeney* v. *Notte*, 95 R. I. 68, 183 A.2d 296, they will not be members *de jure* consistently with the requirements of the full protection clause of the fourteenth amendment to the federal constitution. Nevertheless, because of the exigencies of the situation which prevented the general assembly from complying fully with the decision in *Sweeney* v. *Notte*, such members will constitute a house of representatives *de facto*. Its enactments as such will be valid notwithstanding the present general assembly's inability to reapportion the house conformably to the federal constitution.

There is abundant authority in support of the view that the acts of *de facto* officers are valid. *Apice* v. *American Woolen Co.*, 74 R. I. 425; *Angell* v. *Steere*, 16 R. I. 200; *Pleasant Hills Borough* v. *Jefferson Township*, 359 Pa. 509; *State* v. *Carroll*, 38 Conn. 449; *State* v. *Levy*, 113 Vt. 374.

The difficulty usually arises in determining whether the officers in question are truly *de facto*. When this point is settled the difficulty disappears. While it may be contended that the members elected on November 6 on the basis of a known unconstitutional apportionment could not qualify as *de facto* officers, I am of the opinion that because of the peculiar circumstances of the present situation and because of the overriding importance and necessity of the

legislative department to the orderly functioning of the state government such a contention must fail. To hold otherwise would be in effect a judicial invitation to create disorder and chaos.

FRANCIS B. CONDON