162 N.W.2d 262 (1968)
183 Neb. 502, 521
STATE of Nebraska ex rel. Loren MORRIS, Appellee, Cross-Appellant,
v.
Frank MARSH, Secretary of State, State of Nebraska, Appellant, Cross-Appellee.
Impleaded with Clarence A. H. Meyer, Attorney General, State of Nebraska, Appellee.
No. 37128.
Supreme Court of Nebraska.
October 21, 1968.
Opinion Filed November 15, 1968.
*264 Clarence A. H. Meyer, Atty. Gen., Calvin E. Robinson, Asst. Atty. Gen., Lincoln, for Marsh.
Ray Simmons, Fremont, and John A. Wagoner, Grand Island, for State ex rel. Loren Morris.
Heard before WHITE, C.J., SPENCER, BOSLAUGH, SMITH, McGOWN and NEWTON, JJ., and KOKJER, D. J.
PER CURIAM.
On September 16, 1968, the district court entered its peremptory writ of mandamus to Frank Marsh, Secretary of State, commanding him to take the necessary steps to place on the ballot in the November 5, 1968, Nebraska general election, the initiative petition proposal seeking a constitutional amendment prohibiting the State of Nebraska from leving an income tax for state purposes, and requiring him to accept and file the initiative petition therefor, and to take the other actions required by the Constitution of the State of Nebraska and Nebraska statutory provisions to assure that said initiative proposal be placed on the ballot.
The matter was advanced for hearing on the docket of this court and was argued and submitted on October 16, 1968.
Now on this 21st day of October 1968, the order of the district court that peremptory writ of mandamus to the Secretary of State be issued and writ allowed is affirmed. Written opinion to be filed on a later date.
Affirmed.
SPENCER, Justice (dissenting).
I respectfully dissent from the majority ruling herein. When the written opinion is filed, I will elaborate on the reasons for my position. For the present, I state that to hold as the majority do is to abort the provisions of section 32-704, R.R.S.1943. I would dismiss the action for failure to file an itemized verified statement of contributions and expenses within a reasonable time, as required by that statute. I am also satisfied that the case should be dismissed on its merits. A necessarily limited review of the law applicable convinces me that a sufficient number of valid objections were made by the Secretary of State to invalidate the petitions.
NEWTON, J., joins in this dissent.

OPINION
Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ., and KOKJER, D. J.
McCOWN, Justice.
This is a mandamus action to require the Secretary of State to accept and file an initiative petition seeking a constitutional amendment prohibiting the State of Nebraska from levying an income tax for state purposes.
On February 7, 1968, a copy of the form of initiative petition to be used, together with a sworn statement as to the names of persons or corporations sponsoring the petition or contributing or pledging contributions, was filed with the Secretary of State. There is no contention that either of these documents were not in compliance with statutory requirements.
*265 On July 3, 1968, petitions bearing the signatures of 57,521 electors were filed with the Secretary of State. On July 5, 1968, additional petition forms were filed. The number of valid signatures required was 48,640. No issue is raised as to the constitutionally required distribution among counties.
On July 3, 1968, a verified statement as to persons or corporations contributing or receiving money or other thing of value was filed with the petition forms. Supplemental itemized verified statements were filed on August 12 and August 28, 1968. On July 26, 1968, the Secretary of State issued his certification in which he found that less than 48,640 of the signatures were acceptable or valid, and that the person or persons presenting such petitions failed to file a satisfactory itemized verified statement as provided by section 32-704, R.R.S.1943. He then found the initiative petition to be insufficient and refused to certify the proposed amendment to the ballot for the 1968 general election.
This action was filed in the district court for Lancaster County on August 5, 1968. Peremptory writ of mandamus was issued on September 16, 1968, requiring the respondent Secretary of State to accept and file the initiative petition and to take the necessary steps to place the issue on the ballot for the November 5, 1968, general election. On appeal to this court, the matter was advanced for hearing and on October 21, 1968, Per Curiam judgment was entered affirming the judgment of the district court, with written opinion to follow.
The evidence and stipulations at the hearings in the district court indicate that the respondent Secretary of State rejected some 14,000 signatures, approximately 25 percent of those filed. It is conceded by the respondent that 43,964 valid signatures were filed on July 3, 1968 before 5 p. m. It is also conceded that there were 2,494 signatures contained on petitions filed after 5 p. m. on July 3, 1968, and on July 5, 1968, which would have been valid except for the "late filing."
The constitutional provisions dealing with the initiative are basic. Article III, section 1, of the Constitution of Nebraska, provides in part: "The people reserve for themselves, however, the power to propose laws, and amendments to the constitution, and to enact or reject the same at the polls, independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act, item, section, or part of any act passed by the Legislature."
Article III, section 2, Constitution of Nebraska, provides in part: "The first power reserved by the people is the initiative whereby laws may be enacted and constitutional amendments adopted by the people independently of the Legislature. * * * The constitutional limitations as to the scope and subject matter of statutes enacted by the Legislature shall apply to those enacted by the initiative."
Article III, section 4, Constitution of Nebraska, provides in part: "The method of submitting and adopting amendments to the Constitution provided by this section shall be supplementary to the method prescribed in the article of this Constitution, entitled, `Amendments' and the latter shall in no case be construed to conflict herewith. The provisions with respect to the initiative and referendum shall be self-executing, but legislation may be enacted to facilitate their operation."
The inter-action and effect of these constitutional provisions upon statutes intended to "facilitate their operation" has been considered many times. In Klosterman v. Marsh, 180 Neb. 506, 143 N.W.2d 744, we said: "Constitutional provisions with respect to the right of initiative and referendum reserved to the people should be construed to make effective the powers reserved. The case of State ex rel. Ayres v. Amsberry, 104 Neb. 273, 177 N.W. 179 [178 N.W. 822] although later *266 vacated on procedural grounds stated: `The amendment under consideration reserves to the people the right to act in the capacity of legislators. The presumption should be in favor of the validity and legality of their act. The law should be construed, if possible, so as to prevent absurdity and hardship and so as to favor public convenience.' The court later said: `Any legislation which would hamper or render ineffective the power reserved to the people would be unconstitutional.'"
We also said in State ex rel. Ayres v. Amsberry, 104 Neb. 273, 177 N.W. 179, "Laws to facilitate the operation of the amendment must be reasonable, so as not to unnecessarily obstruct or impede the operation of the law." It is clearly the duty of this court to give a statute an interpretation which meets constitutional requirements if it can be reasonably done. State ex rel. Winter v. Swanson, 138 Neb. 597, 294 N.W. 200.
Relator filed pages of the initiative petition on July 5, 1968, to support a submission at the general election scheduled for November 5. Respondent ruled that the filing was untimely under Article III, section 2, Constitution of Nebraska, which reads in part: " * * * when thus signed the petition shall be filed with the Secretary of State, who shall submit the measure * * * at the first general election held not less than four months after such petition shall have been filed."
The district court concluded that the filing on July 5 was timely for submission on November 5. Discovering no authoritative precedent, he took the position of Pafford v. Hall, 217 Ark. 734, 233 S.W.2d 72, which construed the following provision: " * * * Initiative petitions * * * shall be filed * * * not less than four months before the election at which they are to be voted upon * * *." Ark.Const. amend. 7. Pafford applied the general rule followed in most United States jurisdictions, the court saying: "* * * This election is to be held on November 7, and it is argued that the filing of the petition on July 7 was one day too late. That result can be reached only by excluding both the first and the last day * * * we have consistently held that only one of the two days need be excluded."
Nebraska analogies trend in opposite directions. The minority method of computation was approved for determination of the effective date of legislation in McGinn v. State, 46 Neb. 427, 65 N.W. 46, 30 L.R.A. 450; and Summerville v. North Platte Valley Weather Control Dist., 170 Neb. 46, 101 N.W.2d 748. See, Dillon v. Gloss, 256 U.S. 368, 41 S.Ct. 510, 65 L.Ed. 994; In re Donaldson, 138 F.2d 419, 35 CCPA 701; Mushel v. Board of County Commissioners of Benton County, 152 Minn. 266, 188 N.W. 555; generally 98 A.L.R.2d 1331. Other Nebraska cases adopted the majority method. A requirement that certificates of nomination be filed at least 8 days before election was satisfied by a filing on October 31 for election on November 8. State ex rel. Eastham v. Dewey, 73 Neb. 396, 102 N.W. 1015. A requirement for service of summons 3 days before trial was met by service on December 24 of summons returnable December 27, the trial date, in Messick v. Wigent, 37 Neb. 692, 56 N.W. 493. See, also, White v. German Ins. Co., 15 Neb. 660, 20 N.W. 30; Gurske v. Britt, 86 Neb. 312, 125 N.W. 539.
The fiction of an indivisible day is "a figurative recognition of the fact that people do not trouble themselves without reason about a nicer division of time." Burnet v. Willingham L. & T. Co., 282 U.S. 437, 51 S.Ct. 185, 75 L.Ed. 448. Measurement based on the fiction is approximate whether we exclude both or only one of the terminal days. Apart from the fiction, the deviation in this case was probably several hours, surely less than 24, out of 4 months. There is little or no dispute that in terms of a full day and an exact date, November 5 is a date exactly 4 months after July 5. The respondent attempts to read the language of the Constitution as requiring *267 the election to be held more than 4 months after the filing of the petition, instead of "not less than 4 months." (Emphasis ours.) The district court's computation was correct.
We hold that a requirement that an initiated measure be submitted at the first general election held not less than 4 months after filing of the petition is satisfied by a filing on July 5 for a general election to be held November 5.
The respondent objected to and disqualified the pages of the petition and every signature thereon where the circulator of the particular pages did not sign his full Christian name to the verification or, if a woman, signed the verification with her husband's name preceded by her title. His theory was that a circulator is required to be an elector and there is no presumption to that effect unless he has signed his full Christian name as required for signers of a petition by a portion of section 32-713, R.S.Supp.1967. That portion provides that an elector signing an initiative petition shall personally affix his surname and Christian name in full. W. C. Fitzwater and A. J. Treutler, as circulators, signed verification affidavits on the petitions circulated by them, using their initials rather than their full Christian names. There were 851 signatures disqualified by the respondent on this ground. Evidence in the district court established that the signatures of these circulators as signed were used and generally accepted in their home communities as their legal signatures.
A proviso of section 32-713, R.S.Supp.1967, permits even the ordinary signer of a petition to use his generally accepted legal name in the community. It should be noted also that the verification affidavit signed by a circulator states under oath that he is a legal and qualified voter of the State of Nebraska. No such affidavit is required of an ordinary signer and the disqualification of a nonregistered elector is also specifically removed by a proviso of section 32-713, R.S.Supp.1967, itself where the signing elector files with the petition an affidavit setting forth the fact that he is a qualified elector. Certainly the affidavit of the circulator meets that requirement.
The same statute, section 32-713, R.S.Supp. 1967, specifically provides: "Any person signing any name other than his own to any petition, or knowingly signing his name more than once for the same measure at one election, or who is not, at the time of signing or circulating the same, a legal voter and qualified to sign or circulate the same, or any person who shall falsely swear to any signature upon any such petition, or any officer or person willfully violating any provision of sections 32-702 to 32-713, shall be deemed guilty of a felony and, upon conviction thereof, shall be punished by a fine not exceeding five hundred dollars, or by imprisonment in the Nebraska Penal and Correctional Complex not exceeding two years, or by both such fine and imprisonment." In the light of such criminal sanctions and the specific constitutional provisions preserving the right of initiative, presumptions must be in favor of legality rather than illegality.
We hold that where the circulator of an initiative petition has signed and sworn to a properly executed statutory form of affidavit that he or she is a legal and qualified voter of the State of Nebraska, there is a presumption that he or she is a qualified elector in the absence of affirmative evidence to the contrary. This presumption does not disappear simply because he or she has not signed his or her full Christian name.
The district court validated the 851 signatures obtained by W. C. Fitzwater and A. J. Treutler and this action was clearly proper.
The district court limited its consideration to the signatures on the petitions circulated by Mr. Fitzwater and Mr. Treutler. *268 There were 320 additional signatures on petitions which were rejected by respondent under the same objections, but as to which there was no specific testimony as to the legal name of the specific signing circulator. We, therefore, validate an additional 320 signatures which were not counted nor considered by the district court.
The respondent rejected all petitions circulated by one John Sims. These contained over 1,000 signatures, of which 755 were conceded by the respondent to be valid except for the fact that they were circulated and verified by John Sims. The basis for the challenge was that John Sims himself had signed two similar petition forms, one as a resident of Grand Island and the other as a resident of Omaha. These forms were circulated by others. The respondent contends that since Sims violated the law as a signer of other petitions, his sworn statement as a circulator of petitions should be regarded as false even though there is no evidence of fraud or irregularity on the part of Mr. Sims in his circulation of the petition. We cannot agree. Cases indicating that where there has been proven fraud in the obtaining of one or more petitions by a circulator, all petitions obtained by him should be disqualified are not applicable. As the district court found: "Whatever mistake he made as an individual signer should not taint the petitions circulated by him."
In Cobb v. Burress, 213 Ark. 177, 209 S.W.2d 694 (1948), the court specifically rejected an argument such as the respondent makes here. In that case, the court refused to disqualify parts of a petition where there was no proof that those parts contained nongenuine signatures even where the alleged misconduct of the individual was as a circulator.
If presumptions are to be indulged in, the presumption ought to be that acts performed in the circulation of petitions are legal rather than fraudulent. See, State ex rel. Ayres v. Amsberry, supra; In re Initiative Petition No 281, State Question No. 441 (Okl.), 434 P.2d 941 (1967).
The respondent conceded that 755 of the signatures obtained by Mr. Sims were otherwise valid, but contends that they should be invalidated on a vague presumption that the sworn affidavit of the circulator is false. We see no justifiable reason to disfranchise electors in the exercise of their constitutionally reserved right of the initiative on such grounds.
Where there is no evidence of fraud or irregularity on the part of the circulator in his circulation of the initiative petitions, evidence that he, as an individual, signed two other petition forms for the same measure does not destroy the presumption of validity of his affidavit as a circulator nor justify the disqualification of concededly valid signatures obtained by him as circulator.
We confirm the action of the district court in validating 755 signatures obtained by John Sims as circulator.
The respondent also challenged signatures in which the address of the signer was a city or village which was not located in the county stated in the preamble of the petition page. There were 191 signatures appearing in Sarpy County petitions where the signer indicated an Omaha address. The theory of the objection is that Omaha is in Douglas County and a Douglas County resident cannot sign a Sarpy County petition. As the lower court found, it is a well-known fact of which the court can probably take judicial notice, that there are many who have Omaho post office addresses who actually live in Sarpy County. In any event, there was ample evidence adduced by the relator to establish this fact and there was no attempt to controvert that evidence. Neither was there any evidence that any signer of these petitions was not a resident of Sarpy County. We confirm the action of the district court in validating 191 Sarpy County signatures rejected by the respondent.
*269 Two categories of objections made by the respondent relate to an incomplete or missing date opposite a particular signature, or to the date having been written by someone other than the signer. In practically every instance of an incomplete or missing date, the deficiency occurred on a signature and date line situated between two correctly stated and identical dates, and for the most part, the same circumstances were involved in the cases of the date having been written by someone other than the signer. As the trial court found: " * * * the incomplete date followed, for example, June 3, 1968 and was itself followed by June 3, 1968, which would make it readily apparent that the missing or incomplete date was in fact June 3rd." The date of signing an initiative petition is obviously important because a signer must be an elector on that date. The problem of what presumptions shall apply in the construction of statutory provisions which are constitutionally permitted to "facilitate" the exercise of the initiative power reserved to the people has often been considered by the courts. As this court said in State ex rel. Ayres v. Amsberry, supra; "The amendment under consideration reserves to the people the right to act in the capacity of legislators. The presumption should be in favor of the validity and legality of their act. The law should be construed, if possible, so as to prevent absurdity and hardship and so as to favor public convenience."
The decisions almost universally hold that the power of initiative must be liberally construed to promote the democratic process and that the right of initiative constitutionally provided should not be circumscribed by restrictive legislation or narrow and strict interpretation of the statutes pertaining to its exercise. Farley v. Healey, 67 Cal.2d 325, 62 Cal.Rptr. 26, 431 P.2d 650 (1967); Cochran v. Black, 240 Ark. 393, 400 S.W.2d 280 (1966); Potash v. Molik, 35 Misc.2d 1, 230 N.Y.S.2d 544 (1962).
Section 32-705, R.S.Supp.1967, ends with the following language: "All signatures secured in a manner contrary to the provisions of sections 32-702 to 32-713 shall not be counted. Clerical and technical errors in a petition shall be disregarded if the forms herein prescribed are substantially followed."
The respondent argues that the statutorily prescribed forms are mandatory and inferentially that the language was intended to apply only to clerical and technical errors in the form of a petition and not to the manner of execution. We think the language of the statute is definite and speaks for itself. The district court was correct in holding that the objection was a technical objection where the actual date of signing was readily apparent. It should be noted here also that in the verification of the circulator, required by section 32-705, R.S.Supp.1967, the circulator must swear under oath to two specific facts. These are that each person whose name appears on the petition sheet personally signed the petition in the presence of the affiant, and that the date to the left of each signature is the correct date on which the signature was affixed to the petition. All other matters in the required verification are on belief.
On an otherwise validly executed initiative petition form, where the actual and exact date on which the signature of an elector was signed is readily apparent, the omission or faulty rendition of the date should be treated as a clerical or technical error and constitutes substantial compliance with the statute. See, State v. Several Parcels of Land, 78 Neb. 225, 110 N.W. 753; Potash v. Molik, supra; Haraway v. Armstrong, 95 Colo. 398, 36 P.2d 456. The district court validated 804 signatures involving dates in this category. That action is affirmed.
The district court also validated 154 signatures involving addresses of signers where ditto marks were used for a part *270 or all of the address, or where portions of the address were written by someone other than the signer. Ditto marks have a clear and definite meaning and their use on an initiative petition cannot be held objectionable. Thompson v. Vaughan, 192 Mich. 512, 159 N.W. 65; Halgren v. Welling, 91 Utah 16, 63 P.2d 550; Dawson v. Meier (N.D.), 78 N.W.2d 420. As to complete post office addresses see Bartling v. Wait, 96 Neb. 532, 148 N.W. 507. The action of the district court in validating these signatures is also affirmed.
At this point, the total number of signatures found to be valid is 49,533, which is in excess of the 48,640 required. Many categories of objections and challenges as to several thousand additional signatures remain. We find no necessity to consider these nor the issues raised in the relator's cross-appeal.
One final issue remains to be considered. The respondent contends that the statutory requirement that an itemized verified statement of contributions and expenses be filed at the time the initiative petition is presented for filing is mandatory and essential to the sufficiency of the petition. The argument is that the statute should be strictly construed to require not only that a statement be filed at the exact time specified, but that it must be full and complete in every detail at that time.
Section 32-704, R.R.S.1943, provides in part: "Prior to obtaining any signatures to the petition, a copy of the form to be used shall be filed with the Secretary of State, together with a sworn statement containing the name or names of every person, corporation or association sponsoring the petition, or contributing or pledging contribution of money or other things of value for the purpose of defraying the cost of the preparation, printing, or circulation thereof. Upon the presentation of such petition for filing, the Secretary of State shall determine its sufficiency. The person presenting the petition shall, at the same time, file with the Secretary of State an itemized verified statement containing the names and addresses of all persons, associations of persons, and corporations contributing money or other thing of value toward, and receiving money or other thing of value for the preparation, circulation, or printing thereof, showing the total amount contributed, pledged, or received by each."
We note first that no time limit nor any date for filing an initiative petition is specified by either the Constitution nor any statute. The right of initiative is not restricted to any particular time. When an initiative petition bearing sufficient valid signatures is filed with the Secretary of State, the Constitution requires him to submit the measure proposed at the first general election held not less than 4 months after such petition shall have been filed. The statute requires the Secretary of State to determine the sufficiency of the petition upon its presentation for filing. If a petition is sufficient, the only thing determined by the date of filing is the election at which it shall be submitted to the electors of the state.
Neither section 32-704, R.R.S.1943, nor any other section of the statutes dealing with initiative petitions provide for any action to be taken by the Secretary of State in the event the itemized verified statement is not filed or is incomplete or unsatisfactory. It should also be noted that the requirement for filing the second verified statement follows, rather than precedes, the requirement that the Secretary of State shall determine the sufficiency of the petition.
The respondent relies heavily upon the case of State ex rel. Winter v. Swanson, supra. In that case this court held that the filing of a copy of the form of petition to be used and of the first sworn statement was mandatory. That case, however, involved a complete failure to file both the copy of the form of petition to be used and the preliminary sworn statement. In that case, this court stated: "It is clearly the *271 duty of this court to give a statute an interpretation which meets constitutional requirements if it can be reasonably done." This court then stated that it was the intent of the Legislature that only information known to the relators at the time the form of petition was filed was contemplated as being required in the sworn statement.
In the case before us, there is no evidence whatever as to what information, in addition to that disclosed, was known to the affiant who made and filed the itemized verified statement on July 3, 1968. It is also tacitly conceded that the supplemental itemized verified statement filed on August 28, 1968, met every requirement of section 32-704, R.R.S.1943, except as to the time of filing.
It would seem apparent that the purpose of the statutory provision with respect to the second verified statement provided for in section 32-704, R.R.S.1943, was to make available to the public, in advance of the election, information as to what individuals or corporations had financially supported or benefited by the petition campaign and the amounts involved. August 28, 1968, was several weeks before the respondent was required to furnish election officials certified copies of ballot titles, and publish copies of titles and texts of the matters to be submitted.
The case of State ex rel. McPherson v. Snell, 168 Or. 153, 121 P.2d 930 (1942), we believe to be determinative of this issue. The Oregon Supreme Court held, under constitutional provisions almost identical with ours, that: "A substantial compliance with the statute in filing the statement of contributions and expenditures is all that is required." The court cited with approval both Nebraska cases of State ex rel. Ayres v. Amsberry, supra, and State ex rel. Winter v. Swanson, supra, and said with respect to an Oregon statute similar to ours, requiring the filing of statements of contributions and expenditures in connection with initiative or referendum petitions: "Accordingly, this court ought not to give it such construction as to make it a hindrance to and burden upon the exercise of the rights conferred by § 1 of Article IV of the constitution."
It should be noted also that the Oregon statute specifically provided: "If such verified statement is not filed, as herein required, the secretary of state shall not place the measure petitioned for on the official ballot." Our statute has no provision of any kind as to the effect of failure to file.
The district court in the case at bar, while it found that the itemized financial statement submitted on July 3, 1968, at the time of filing of the petition, was not complete, nevertheless found that "with the supplemental statement filed on August 28, 1968, the Court finds that these statements contain the information known to the petitioners at the time of filing and constitute substantial compliance with the requirement." That finding was correct.
We hold that a substantial compliance with section 32-704, R.R.S.1943, in filing the itemized verified statement of contributions and expenditures is all that is required.
The power to tax is essential to the continued existence of a state. A constitutional amendment which would destroy or completely emasculate that power might well be itself unconstitutional. That issue is not presently here.
The judgment of the district court was correct and is affirmed.
Affirmed.
SPENCER, Justice (dissenting).
I join in the dissent of Newton, J., and personally dissent from the majority opinion herein for three reasons, each of which *272 alone is sufficient to reverse the granting of mandamus herein: First, I do not believe that the initiative process may be used to limit the power of the legislative branch of government to provide for the proper financing of the state government; second, the petition herein failed to comply with the necessary procedure to permit the placing of this issue on the ballot; and, third, the petition filed does not contain a sufficient number of legal signatures to place the issue on the ballot.
The Enabling Act of April 19, 1864, requires: "That the constitution when formed shall be republican, and not repugnant to the constitution of the United States and the principles of the Declaration of Independence; * * *."
Essentially there are only three principal means of taxation adequate to support our state government: Taxation of property, income taxes, and sales taxes. The state has already been excluded from levying taxes on property for the support of state government, so only income taxes and sales taxes remain. This immediately raises the question: If the income tax is eliminated, is the sales tax sufficient to sustain a republican form of government? I do not believe it is without raising the rate so high that it would be oppressively burdensome. In my judgment we have now reached the point where we must meet this issue. It is obvious that a republican form of government, as we understand it, cannot be maintained without adequate taxation. I therefore maintain, for the reasons cited by Newton, J., in his dissent, that to use the initiative procedure herein is violative of the restriction imposed upon us by the Enabling Act, and consequently is unconstitutional.
On the second point, section 32-704, R.R.S.1943, provides in part: "The person presenting the petition shall, at the same time, file with the Secretary of State an itemized verified statement containing the names and addresses of all persons, associations of persons, and corporations contributing money or other thing of value toward, and receiving money or other thing of value for the preparation, circulation, or printing thereof, showing the total amount contributed, pledged, or received by each." (Italics supplied.)
The sponsor of the initiative petition herein on July 3, 1968, filed a statement which could not conceivably be considered in compliance with the law. The district court found it "was certainly not complete." Section 32-704, R.R.S.1943, also provides for the filing of a preliminary itemized verified statement prior to the obtaining of any signatures on the petition. The case of State ex rel. Winter v. Swanson, 138 Neb. 597, 294 N.W. 200, dealt with this latter situation. That case held: "We think the constitutional provision authorizing the legislature to enact laws to facilitate the operation of the initiative power means that it may enact reasonable legislation to prevent fraud or to render intelligible the purpose of the proposed law or constitutional amendment. See State [ex rel. Ayres] v. Amsberry, 104 Neb. 273, 177 N.W. 179, 178 N.W. 822. Any legislative act which tends to insure a fair, intelligent, and impartial result on the part of the electorate may be said to facilitate the exercise of the initiative power. We believe the provisions of the act before us meet these requirements.
"The requirement that the form of the petition be filed with the secretary of state before the petitions were circulated is calculated to advise the electorate in advance as to the exact provisions of the proposal through publicity resulting from its filing. By this means the proposal is rendered intelligible and the possibilities of fraud greatly reduced. The requirement that the name of every person, corporation or association sponsoring the petition or contributing or pledging contributions to defray the cost of preparation, printing and circulation of petitions be filed is likewise a safeguard against fraud and deception. We think the legislature was authorized *273 to enact the mentioned requirements under its granted authority to facilitate the exercise of the initiative power.
"Relators contend that the questioned provisions of the statute are directory and not mandatory. It seems to us that none of the features of a directory statute is present in this case. It would seem to us that an anomalous situation would be created if statutory safeguards against the perpetration of frauds and deceptions were held to be directory. Such requirements must by their very nature be mandatory, or the purposes of the legislature will be completely defeated. We hold that the provisions of the statute herein discussed are mandatory and that the failure of realtors to comply therewith justifies the action of the secretary of state in refusing to file the same."
On July 26, 1968, the Secretary of State rejected the petition because of the inadequacy of valid signers, and for the further reason that the person presenting the petition failed to file a satisfactory itemized verified statement, as provided by section 32-704, R.R.S.1943. On August 12, 1968, petitioner attempted to amend his verified statement. This statement also was clearly inadequate and made no pretense of giving the amount contributed by individual donors. On August 28, 1968, the day the case went to trial in the district court, petitioner again filed a supplemental itemized statement which is properly itemized, which incidentally lists several corporate contributors. To hold that petitioner has substantially complied with the law is, at the very least, abortive of that term. Certainly the majority opinion has for all intents and purposes overruled the case of State ex rel. Winter v. Swanson, 138 Neb. 597, 294 N.W. 200, and deleted the words "at the same time" from the statute.
The third reason the petition should be stricken is that there are insufficient signatures to justify its submission. I do not agree with the majority opinion that the filings on July 5, 1968, were timely for submission on November 5, 1968. It is not necessary to go to Arkansas for authority. If we followed the law of this jurisdiction, the filings on July 5 would be excluded. One of the earliest decisions of this court on the question of time passage is McGinn v. State, 46 Neb. 427, 65 N.W. 46, 30 L.R.A. 450, 50 Am.St.Rep. 617. That case was concerned with the determination of the effective date of a statute under Article III, section 27, Constitution of Nebraska, which is as follows: "No act shall take effect until three calendar months after the adjournment of the session at which it passed, * * *." In that case this court discussed the matter of computation of time at great length and determined in the computation of time by months, calendar months are to be counted rather than months of uniform number of days. This court there determined that where a legislative act was approved on April 8, 1893, the 3 months terminated at midnight on the 8th day of July 1893, so that the act became effective on the 9th day of July, or the day after the expiration of the full 3-months period. Article III, section 2, Constitution of Nebraska, provides that the Secretary of State shall submit the initiative measure at the first general election held not less than 4 months after said petition shall have been filed. Here, the last day of the first month would be August 5; the last day of the second month, September 5; the last day of the third month, October 5; and the last day of the fourth month, November 5. Consequently, November 5 would not be 4 months after July 5. The four months do not expire until midnight November 5. As we said in the early case of Glore v. Hare, 4 Neb. 131: "We can no more extend the time one day than six months."
To me, the language of the Constitution is clear and mandatory. In my judgment the majority opinion has rewritten that provision of the Constitution. I would exclude the 1,979 signatures filed on July 5, 1968. The majority opinion gives 49,-533 signatures as valid. Excluding only these 1,979 signatures filed July 5, 1968, *274 would give a total of 47,554, or approximately 1,100 below the required number.
Section 32-705, R.S.Supp.1967, requires each petition circulator to swear that he informed each elector before he affixed his signature of the legal effect and the nature of the petition being signed. W. C. Fitzwater was produced as a witness at the trial. He circulated several petitions found by the trial court to contain 471 valid signatures. From his testimony it is evident he did not himself understand the legal effect and the nature of the petitions he was circulating. On cross-examination he did not even know whether a statute or a constitutional amendment was involved. Obviously he could not have complied with the statute. If he did not himself understand the petition he could not have explained its nature and legal effect to the signers. Consequently, the 471 purportedly valid signatures secured by him should be excluded.
One John B. Sims actively circulated several petitions over a period of several months, securing more than 1,000 signatures. The trial court found 755 of these to be valid. Sims clearly violated many of the provisions governing the filing of initiative petitions. Specifically, he personally signed two different petitions and gave a Grand Island address for one signature and an Omaha address for the other. He obviously knew that he could not be an elector in both Hall and Douglas counties at the same time. At the very least, Sims, who verified all of his petitions, must be held to know the contents of those verifications. On the evidence produced, it must be held that Sims fraudulently signed the petitions.
In Barkley v. Pool, 103 Neb. 629, 173 N.W. 600, we held: "When the certificate of a circulator of a referendum petition under the initiative and referendum act is impeached on the ground of fraud, the probative value of such certificate is destroyed, and none of the names appearing on such petition will be counted unless affirmatively proved to be genuine." I would therefore refuse to count the 755 names secured by Sims unless and until they were affirmatively proved to be genuine. This was not done. Consequently, these 755 names should not be included in the total of valid signatures.
There are many of the petitions which were signed more than once by the same signers. It is of course possible that these were instances where the signer had forgotten that he had signed a previous petition, and I am inclined to give the signer the benefit of the doubt in those instances. Two of these petitions, however, circulated by Marvin E. Dennis in Lancaster County, cannot be so easily explained. One of the petitions contains 15 signatures, the other 20. Two of the signers on both petitions were identical. Both of them signed each petition on July 2, 1968. Both of them live in the same neighborhood in Lancaster County. On one of the petitions, the two signatures are together, and on the other they are separated by one other signature. It would be highly illogical to assume from an examination of these petitions that either of the individuals or the circulator would have forgotten that they had signed another petition for the same circulator on the same day. It would disqualify both of the petitions and exclude the 35 signatures appearing thereon.
Section 32-713, R.S.Supp.1967, so far as material herein, provides: "Each signer shall at the time of signing, personally affix his surname, and Christian name in full, except that the middle name or initial may be omitted, and if the Christian name is an initial only, the signer shall so state below the name at the time of signing; * * * the date of signing and residence, street and number, or if no street or number exists then a designation of a rural route, or the voting precinct and city or village."
The Secretary of State made 524 objections based upon a missing or an incomplete date, and 280 objections on dates *275 which were written in by parties other than the signer. He also objected to 106 names where the addresses were written by someone other than the signer of the petition. None of these 910 signers complied with the law, and the challenge by the Secretary of State should have been sustained. These objections were all overruled by the majority opinion herein.
The date of signing is important because the signer must be an elector at the time of signing. The correct address is important because it is needed to identify the signer and to make it possible to determine if he is in fact an elector at the time of signing. To permit the counting of these signatures is to repeal the statute. To permit individuals other than the signer to write the date and the address is to make it more difficult to detect fraud in the petitions. The ultimate effect of the majority ruling herein is to require the Secretary of State to accept every petition presented unless he personally investigates every one of the 59,000 plus signatures to ascertain if those signers personally signed the petition.
The Secretary of State also rejected 48 signatures because ditto marks appeared where the address should have been written. The portion of section 32-713, R.S.Supp.1967, set out above requires each signer of the initiative petition to endorse thereon his residence and city or village. This does not seem to be a burdensome or unreasonable requirement. Even though ditto marks can be interpreted to mean "the same as above," as suggested by the majority opinion, I cannot agree that the requirements of our statute have been met. The statute requires each person to write his residence, street and number or the voting precinct, and city or village. This he must do, as I interpret the statute. This is not an unreasonable requirement because the use of ditto marks make it much more difficult to establish a forgery if one has occurred. If one person has written the name of a city several times, such writing would be more readily detectible than if that person had merely written in ditto marks. In State ex rel. Jensen v. Wells, 66 S.D. 269, 281 N.W. 357, the South Dakota court held that unless specifically permitted by law, the signers of a petition could not use ditto marks in the date column. It seems to me that this is the only logical rule to be applied in a procedure as important as an initiative petition.
A recapitulation of the objections listed above indicates to me that 4,198 of the challenges made by the Secretary of State should have been sustained. The majority opinion finds 49,533 valid signatures. Subtracting 4,198 would leave only 45,335, based on the figures used. A minimum of 48,640 valid signatures was required. The petition filed was therefore 3,305 short of enough to qualify, and the Secretary of State was correct in refusing to accept the filing.
NEWTON, Justice (dissenting).
I join in the dissent of Spencer, J., regarding the time within which an initiative petition must be filed prior to the election at which the issue is submitted to the electors. I am also in agreement with that portion of the dissent of Spencer, J., which is based upon the failure of plaintiff to comply with that portion of section 32-704, R.R.S.1943, which requires that an itemized verified statement containing the names and addresses of all persons, associations of persons, and corporations contributing money or other thing of value toward, and receiving money or other thing of value for the preparation, circulation, or printing thereof, showing the total amount contributed, pledged, or received by each.
Article III, section 4, Constitution of Nebraska, specifically provides that legislation may be enacted to facilitate the operation of the initiative and referendum provisions. The requirement that such a verified statement be filed is a regulation contemplated by the foregoing provisions. Its purpose is to enlighten the electorate at the earliest *276 possible moment of the identity and nature of the parties supporting the proposed constitutional amendment and by such identification to give some insight into the motives of such proponents.
That such a statement was not filed in the present instance is beyond dispute. The lower court erroneously found that this requirement had been complied with substantially and to the best of relator's ability. The fallacy therein is readily demonstrable. The statement filed contained information showing total contributions and expenditures amounting to several thousand dollars, but did not itemize these contributions and expenditures or give the names of contributors and recipients. It is sought to excuse this oversight on the ground that such information may not have been then available, yet it is obvious that if the relator was able to arrive at the total figures submitted, he must then have had knowledge of the various items comprising such totals.
Furthermore, the requirement for the filing of such verified statement has been a law of this state for many years. It was necessarily known to relator when he first contemplated promoting the initiative petition. He was fully aware that it was necessary to wind up the petition circulation campaign in time to gather and present the information required in the verified statement. His neglect to do so is no excuse.
It is contended that the insufficient verified statement actually filed may be amended from time to time to comply with the statutory requirements and such amendments were actually permitted many weeks after the petitions were presented for filing. The majority opinion condones this. Under the theory so adopted, the statement was subject to amendment right up to the day of the election. Such a construction defeats the purpose of the statute and serves to deny the electorate an insight into the forces behind the petition campaign.
The case of State ex rel. Winter v. Swanson, 138 Neb. 597, 294 N.W. 200, deals with a failure to file a similar statement required to be filed prior to the circulation of the petitions. It was there held that the filing of such statement was mandatory and not directory. The same is necessarily true regarding the statement to be filed with the petition.
It would appear that there is a much more fundamental matter presented by the present situation than any that has been thus far considered. The truth of the statement that "the power to tax is the power to destroy" is unquestioned. Conversely, the power to prevent taxation is just as surely the power to destroy government. No government, be it federal, state, or local, can exist without revenue; and governmental revenue is synonymous with taxation.
The powers reserved to the people by initiative and referendum acts have long been regarded as sacrosanct and subject only to constitutional restrictions. The Nebraska Constitution does not explicitly limit the initiative power in any respect and on its face such power appears to be all-inclusive and illimitable. Yet, logically, such cannot be the case.
The primary forms of taxation relied upon by state governments are the property, income, and sales taxes. When the power to levy such taxes is destroyed, it is possible that some other forms of taxation could be substituted; yet it is doubtful that they would be adequate to meet modern governmental needs. In Nebraska we have recently deprived the state of the power to levy property taxes. We are now viewing an effort to abolish the income tax, and if such effort is successful, it would foreshadow an attempt to abolish the sales tax. The various forms of taxation are always opposed by the particular groups affected thereby. The property tax was opposed by property owners, the income tax is opposed by those with substantial incomes, and the sales tax by lower and middle-income groups.
It may be said that while we still have one of the major tax forms available, there is no actual present threat to state government. This begs the question. If the initiative *277 power, carried to its ultimate conclusion in regard to state taxation, can present such a threat, then the fundamental or underlying question is presented now.
The Enabling Act of Congress admitting Nebraska to the Union authorizes and requires the formation of a state constitution and a state government. "Under the provisions of sec. 4 of art. IV of the federal constitution the United States is required to guarantee a republican form of government to every state. * * * `The guaranty necessarily implies a duty on the part of the States themselves to provide such a government.'" Opinion to the Governor, 95 R.I. 109, 185 A.2d 111. The Nebraska Constitution provides for a republican form of government, for a bill of rights, and for the separation of powers. It authorizes the executive branch to place the powers of government in operation, and vests legislative authority in the Legislature, including the power to raise the necessary revenue of the state by taxation. If the initiative power is to be construed to permit the abolition of all taxes for state purposes, it is obviously in conflict with large segments of the State Constitution. The Constitution contemplates a working government duly financed by revenue derived from taxation. Without such revenue, the entire government would be brought to a standstill and rendered inoperative.
Ordinarily the courts will refrain from testing the validity of a legislative act until after it has become effective. Perhaps it is wiser to do so in the present instance, but where an act is of such nature that its passage could present an immediate governmental crisis, it would seem that the better policy would be that of acting before an emergency is presented and the situation becomes acute.
"Each and every clause in a constitution has been inserted for some useful purpose." Anderson v. Tiemann, 182 Neb. 393, 155 N.W.2d 322.
"It is a general rule of construction that a constitution should be construed as a whole and effect given to every part, if possible." 16 C.J.S. Constitutional Law § 23, p. 91. See, also State ex rel. Johnson v. Chase, 147 Neb. 758, 25 N.W.2d 1; Monaghan v. School District No. 1, 211 Or. 360, 315 P.2d 797; Welsh, Governor v. Sells, 244 Ind. 423, 192 N.E.2d 753, 193 N.E.2d 359; Kervick v. Bontempo, 29 N.J. 469, 150 A.2d 34; County School Bd. of Prince Edward County v. Griffin, 204 Va. 650, 133 S.E.2d 565; Mekota v. State Board of Equalization & Assessment, 146 Neb. 370, 19 N.W.2d 633.
"In the interpretation of a constitution, its terms must be taken in their ordinary and common acceptation in such manner as to express the intent of its framers and of the people who adopted it." State ex rel. Johnson v. Marsh, 149 Neb. 1, 29 N.W.2d 799.
Applying the foregoing rules, it seems that the Constitution should be construed as a whole and effect given to all portions thereof as nearly as possible. It cannot be concluded that the initiative provision is to be given such force as to completely nullify other provisions in the Constitution or to destroy that government which the framers of the Constitution created and provided for. If essential governmental functions would be seriously impaired by the initiative and referendum process, the courts, in construing the applicable constitutional and statutory provisions, will assume that no such result was intended.
In the case of Hunt v. Mayor & Council of City of Riverside, 31 Cal.2d 619, 191 P.2d 426, it is said: "* * * referendum provisions of the constitution and of charters and statutes should, as a general rule, be liberally construed in favor of the reserved power. * * * As opposed to that principle, however, `in examining and ascertaining the intention of the people with respect to the scope and nature of those powers, it is proper and important to consider what the consequences of applying it to a particular act of legislation would be, and if upon such consideration it be found that by *278 so applying it the inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental power, the practical application of which is essential, and perhaps, * * * indispensable, to the convenience, comfort, and well-being of the inhabitants of certain legally established districts or subdivisions of the state or of the whole state, then in such case the courts may and should assume that the people intended no such result to flow from the application of those powers and that they do not so apply.'"
In Simpson v. Hite, 36 Cal.2d 125, 222 P.2d 225, it is said: "The initiative or referendum is not applicable where `the inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental power, the practical application of which is essential * * *.'"
Article III, section 2, Constitution of Nebraska, authorizes the use of the initiative for the adoption of "constitutional amendments." The word "amend" means: "To improve. To change for the better by removing defects or faults. * * * To change, correct, revise." Black's Law Dictionary (De Luxe 4th ed.), p. 106. It connotes the antithesis of the word "destroy." The clear wording of this section indicates the initiative may only be used to amend the Constitution and not to destroy either it or the government it has created.
SPENCER, J., joins in this dissent.